No. 25-12814

# In the United States Court of Appeals for the Eleventh Circuit

OFFICE OF THE ATTORNEY
GENERAL, STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

*Plaintiff-Appellant*,

v.

SNAP, INC.,

*Defendant-Appellee.*

**PLAINTIFF-APPELLANT'S OPENING BRIEF**

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
NO. 3:25-cv-00676-MW-HTC

David H. Thompson
Brian W. Barnes
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., NW
Washington, DC 20036
(202) 220-9600
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jtucker@cooperkirk.com

Diane Kondor Oates
Senior Assistant Attorney General
Consumer Protection Division
1 SE 3rd Avenue
Miami, FL 33131
(305) 377-5835
Diane.oates@myfloridalegal.com

Donna Cecilia Valin
Special Counsel, Assistant
Attorney General
Consumer Protection Division
135 West Central Blvd.
Orlando, FL 32801
(407) 316-4840
Donna.valin@myfloridalegal.com

Victoria Ann Butler
Director of Consumer Protection
Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
(813) 287-7950
Victoria.butler@myfloridalegal.com

Nicholas J. Weilhammer
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
(850) 414-3300
nicholas.weilhammer@myfloridalegal.com

*Counsel for Plaintiff-Appellant*

*Office of the Attorney General, State of Florida, Department of Legal Affairs v. Snap, Inc.,*
No. 25-12814

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE REPORT

I certify that the following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations have an interest in the outcome of this case or appeal:

1. Anchors Gordon, P.A., *Counsel for Defendant-Appellee*

2. Barnes, Brian W., *Counsel for Plaintiff-Appellant*

3. Butler, Victoria Ann, *Counsel for Plaintiff-Appellant*

4. Chris Kise & Associates, *Counsel for Defendant-Appellee*

5. Continental PLLC, *Counsel for Defendant-Appellee*

6. Cooper & Kirk, PLLC, *Counsel for Plaintiff-Appellant*

7. FIAM LLC, subsidiary of FMR LLC, *Affiliate of Defendant-Appellee*

8. Fidelity Institutional Asset Management Trust Company, subsidiary of FMR LLC, *Affiliate of Defendant-Appellee*

9. Fidelity Management & Research (Hong Kong) Limited, subsidiary of FMR LLC, *Affiliate of Defendant-Appellee*

10. Fidelity Management & Research Company LLC, subsidiary of FMR LLC, *Affiliate of Defendant-Appellee*

11. Fidelity Management Trust Company, subsidiary of FMR LLC, *Affiliate of Defendant-Appellee*

12. Fields, Lazaro, *Counsel for Defendant-Appellee*

C-1 of 3

*Office of the Attorney General, State of Florida, Department of Legal Affairs v. Snap, Inc.,*
No. 25-12814

13. Florida Office of the Attorney General, Consumer Protection Division, *Counsel for Plaintiff-Appellant*

14. FMR LLC, *Affiliate of Defendant-Appellee*

15. Gordon, A. Benjamin, *Counsel for Defendant-Appellee*

16. Hogan Lovells US LLP, *Counsel for Defendant-Appellee*

17. Izzo, Anne N., *Counsel for Defendant-Appellee*

18. Kise, Christopher M., *Counsel for Defendant-Appellee*

19. Oates, Diane Kondor, *Counsel for Plaintiff-Appellant*

20. Office of the Attorney General James Uthmeier, State of Florida, Department of Legal Affairs, *Plaintiff-Appellant*

21. Snap, Inc., *Defendant-Appellee*

22. Strategic Advisers LLC, subsidiary of FMR LLC, *Affiliate of Defendant-Appellee*

23. Swanson, Reedy, *Counsel for Defendant-Appellee*

24. Tencent Holdings Limited, *Affiliate of Defendant-Appellee*

25. Thompson, David H., *Counsel for Plaintiff-Appellant*

26. Tucker, Jack, *Counsel for Plaintiff-Appellant*

27. Valin, Donna Cecilia, *Counsel for Plaintiff-Appellant*

28. Walker, Mark E., *District Court Judge*

29. Weilhammer, Nicholas J., *Counsel for Plaintiff-Appellant*

30. Wellington, Katherine B., *Counsel for Defendant-Appellee*

*Office of the Attorney General, State of Florida, Department of Legal Affairs v. Snap, Inc.*,
No. 25-12814

Apart from undisclosed members of Appellee, no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Dated: September 24, 2025

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiff-Appellant*

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal poses important questions about federal officer jurisdiction under 28 U.S.C. § 1442(a)(1) and whether a Florida law that regulates specified addictive design features of social media platforms is consistent with the First Amendment as applied to Snap Inc. The Office of the Attorney General, State of Florida, Department of Legal Affairs believes oral argument would assist the Court in deciding these issues.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT.......................................................i

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ........................................................... 3

STATEMENT OF ISSUES....................................................................... 4

STATEMENT OF THE CASE ................................................................. 4

Children and Social Media.................................................................... 4

Florida Enacts HB3 ............................................................................ 8

Snap Violates HB3 ............................................................................. 9

The Department's Action Against Snap.................................................12

STANDARDS OF REVIEW...................................................................15

SUMMARY OF THE ARGUMENT .........................................................15

ARGUMENT.......................................................................................17

    I.   The District Court Lacks Subjects Matter Jurisdiction and Erred When It Denied the Department's Motion to Remand.........................................17

        A.   Snap Did Not Act Under a Federal Officer.................................18

        B.   The Department's Claims Against Snap Are Unrelated to Any Action that Snap Conceivably Took Under Color of Federal Office..................24

    II.  HB3 Is Consistent with the First Amendment, so the District Court Erred When It Concluded that the Department Is Unlikely to Succeed......................27

        A.   HB3 as Applied to Snap Does Not Implicate the First Amendment.....28

B.    If HB3 Implicates the First Amendment, Intermediate Scrutiny Applies........................................................................................36

C.    HB3 Easily Satisfies Intermediate Scrutiny ...................................39

D.    The Other Preliminary Injunction Factors Favor the Department.........47

CONCLUSION ........................................................................................48

# TABLE OF AUTHORITIES

**Cases**                                          **Page(s)**

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986)........................................................................29, 31, 32

*Barnes v. Glen Theatres, Inc.*,
501 U.S. 560 (1991)................................................................................ 28, 29

*Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*,
996 F.3d 243 (4th Cir. 2021) ................................................................. 20, 23

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011).......................................................................................33

*Cabalce v. Thomas E. Blanchard & Assocs.*,
797 F.3d 720 (9th Cir. 2015) ........................................................................20

*Caver v. Cent. Ala. Elec. Coop.*,
845 F.3d 1135 (11th Cir. 2017)...............................2, 17, 18, 19, 21, 22, 23, 24, 26

*Citizens United v. FEC*,
558 U.S. 310 (2010).......................................................................................32

*Colorado v. Symes*,
286 U.S. 510 (1932)..................................................................................1, 22

*Comput. & Commc'ns Indus. Ass'n v. Paxton*,
747 F. Supp. 3d 1011 (S.D. Tex. 2024) ..................................................... 38, 39

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier (CCIA)*,
No. 4:24-cv-00438-MW-MAF, 2025 WL 1570007
(N.D. Fla. June 3, 2025)...................................13, 14, 31, 35, 36, 38, 44, 45, 46

*Comput. & Commc'ns Indus. Ass'n v. Uthmeier*,
770 F. Supp. 3d 1317 (N.D. Fla. Mar. 17, 2025)...................................................11

*Cuban Am. Bar Ass'n v. Christopher*,
43 F.3d 1412 (11th Cir. 1995) .......................................................................4

*DeFiore v. SOC LLC*,
85 F.4th 546 (9th Cir. 2023)..............................................................19, 20, 23, 24

*Eknes-Tucker v. Gov. of Ala.*,
80 F.4th 1205 (11th Cir. 2023)......................................................................47

*Escobar v. Celebration Cruise Operator, Inc.*,
805 F.3d 1279 (11th Cir. 2015).....................................................................15

*Ferrero v. Associated Materials Inc.*,
    923 F.2d 1441 (11th Cir. 1991) ........................................................... 47, 48

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018) ...............................................28, 31, 33, 35

*Free Speech Coal. v. Paxton*,
    145 S. Ct. 2291 (2025) .............................................................41, 44, 45

*Gary v. City of Warner Robbins*,
    311 F.3d 1334 (11th Cir. 2002) .................................................29, 30, 31

*Honeyfund.com v. Gov. of Fla.*,
    94 F.4th 1272 (11th Cir. 2024) ...............................................30, 31, 34, 36

*Indigo Room, Inc. v. City of Fort Myers*,
    710 F.3d 1294 (11th Cir. 2013) ........................................................... 31, 32

*Leathers v. Medlock*,
    499 U.S. 438 (1991) ................................................................................... 36

*Leonard v. Enterprise Rent a Car*,
    279 F.3d 967 (11th Cir. 2002) .................................................................. 17

*MacGinnitie v. Hobbs Grp.*,
    420 F.3d 1234 (11th Cir. 2005) ................................................................. 4

*Magnin v. Teledyne Continental Motors*,
    91 F.3d 1424 (11th Cir. 1996) ...............................................18, 21, 22, 24

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................... 47

*Mills v. Hamm*,
    102 F.4th 1245 (11th Cir. 2024) .............................................................. 15

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
    460 U.S. 575 (1983) ............................................................................. 32, 33

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................................28, 29, 34, 35

*NetChoice, LLC v. Bonta*,
    No. 25-146, 2025 WL 2600007 (9th Cir. Sep. 9, 2025) ...........................34, 39, 44

*NetChoice, LLC v. Griffin*,
    No. 23-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ................................ 38

*NetChoice, LLC v. Yost*,
    778 F. Supp. 3d 923 (S.D. Ohio 2025) ...................................................... 38

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................................................ 37, 39

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ............................................................................ 14, 46

*Rumsfeld v. FAIR, Inc.*,
    547 U.S. 47 (2006) ............................................................................ 28, 31

*Sable Comm'ns v. FCC*,
    492 U.S. 115 (1989) ......................................................................3, 40, 41

*Schleider v. GVDB Operations, LLC*,
    121 F.4th 149 (11th Cir. 2024) ................................................................ 18

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .....................................................................29, 31, 33

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) ......................................................... 25, 26

*Storer Comm'ns, Inc. v. Fla. Dep't of Legal Affs.*,
    591 So. 2d 238 (Fla. Dist. Ct. App. 1991) ............................................. 47

*Summit Med. Assocs. v. Pryor*,
    180 F.3d 1326 (11th Cir. 1999) ................................................................ 4

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020) .............................................................. 47

*TikTok Inc. v. Garland*,
    604 U.S. 56 (2025) .........................................28, 30, 33, 36, 39, 40, 42, 45

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ................................................................................ 37

*United States ex rel. Mitchell v. Hayes Int'l Corp.*,
    415 F.2d 1038 (5th Cir. 1969) ................................................................ 47

*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................................ 31

*United States v. Tovar*,
    146 F.4th 1318 (11th Cir. 2025) ............................................................. 24

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007) .....................................................................19, 20, 22

*Williams v. Boehrer*,
    530 F. App'x 891 (11th Cir. 2013) ............................................................ 4

## Statutes and Laws

6 U.S.C. § 473(b)(2)(F) ...............................................................22

21 U.S.C. § 393(d)(2)(D) .............................................................22

*28 U.S.C. § 1442(a)(1)....................................................1, 12, 15, 17, 21, 23

FLA. STAT.

§ 501.1736........................................................................... 7

*§ 501.1736(1)(e)....................................... 8, 9, 26, 31, 38, 39, 41, 46

§ 501.1736(1)(e)(1)............................................................. 35

§ 501.1736(1)(e)(2)......................................................... 36, 43

§ 501.1736(1)(e)(3)............................................................. 34

§ 501.1736(1)(e)(4)......................................................... 33, 44

*§ 501.1736(2)(a)............................................27, 31, 41, 42, 46

§ 501.1736(2)(a)–(b)(1) ....................................................... 8

*§ 501.1736(3)(a)......................................27, 31, 41, 42, 43, 46

§ 501.1736(3)(a)–(b)(1) ....................................................... 8

§ 501.1736(5)................................................................8, 47

§ 501.1737(3)(a)................................................................ 43

§ 501.207(1)(b) ................................................................. 47

H.B. 3, 2024 Leg., Reg. Sess. (Fla. 2024)........................................ 7

## Other Authorities

14C WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3726
    (rev. 4th ed., May 2025 update) ...........................................25

FLA. H.R., STAFF FINAL BILL ANALYSIS, H.B. 3 (Mar. 28, 2024)............................ 40, 42

Restatement (Third) of Agency

§ 1.01 (A.L.I. 2006)............................................................19

§ 1.01 cmt. c (A.L.I. 2006) ...................................................20

§ 2.02(1) (A.L.I. 2006)........................................................19

## INTRODUCTION

Research shows that the rise in social media use among American adolescents has precipitated a drastic decline in their mental health. Answering a call to address this problem from the Surgeon General under then-President Biden, bipartisan supermajorities of the Florida Legislature enacted House Bill 3 ("HB3"). HB3 regulates social media platforms like Snap Inc.'s ("Snap") Snapchat that use features such as infinite scrolling, autoplay, personal interactive metrics, and push notifications, which exploit behavioral psychology to addict users. Specifically, HB3 prohibits Snap from contracting with children under 14 years old to make Snapchat accounts and from contracting with 14- and 15-year-olds without parental consent because Snap uses those features. Because Snap is openly violating HB3, the Office of the Attorney General, State of Florida, Department of Legal Affairs (the "Department") filed this state-law enforcement action in Florida state court against Snap.

The Supreme Court has long recognized that the "right of the states . . . to make and enforce their own laws is equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it." *Colorado v. Symes*, 286 U.S. 510, 518 (1932). Here, the Department attempted to do just that when it filed this enforcement action. But after Snap filed a notice of removal, the district court denied the Department's motion to remand and embraced Snap's far-fetched theory that the federal officer removal statute provides jurisdiction because two federal agencies placed advertisements on Snapchat.

1

The federal officer removal statute requires more, and this action belongs in state court. *See* 28 U.S.C. § 1442(a)(1). The district court lacks subject-matter jurisdiction because Snap had no authority to act on behalf of the federal agencies that advertised on Snapchat, nor did those agencies exercise any control over Snapchat. And any action that Snap took with respect to the agencies' advertisements is unrelated to Snap's use of addictive features—much less "forms the basis" of the Department's claim under HB3 against Snap. *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017). This Court should hold that the district court lacks subject-matter jurisdiction, vacate, and remand with instructions to grant the motion to remand.

Although this Court should not reach the issue, the district court also erred when it denied the Department's motion for a preliminary injunction because it believed the Department is unlikely to succeed on the merits. Contrary to the district court's ruling, HB3 is consistent with the Free Speech Clause of the First Amendment. Indeed, HB3 does not implicate the First Amendment at all. HB3 regulates nonexpressive conduct (i.e., Snap's contractual relationships with minors) for reasons entirely separate from any message expressed on Snapchat (i.e., Snap's use of addictive features and an algorithm to addict users).

Even if HB3 did implicate the First Amendment, intermediate scrutiny would apply, and HB3 would easily satisfy that standard. The district court applied intermediate scrutiny in name only. Considerable evidence supports the judgment of the Florida Legislature that social media addiction is destroying the mental health of

adolescents and that the use of addictive features by social media platforms contributes to this problem. So HB3 furthers the compelling government interest in protecting the physical and psychological wellbeing of minors. *See Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989). And HB3 furthers this interest with precision. HB3 applies to Snap because it uses addictive features and because there is evidence that minors are at greater risk of more sustained exposure to those features on Snapchat. HB3 prohibits the most vulnerable Snapchat users (minors who are 13 or younger) from making Snapchat accounts, but it allows less vulnerable users (minors who are 14 and 15) to make accounts with parental consent. Although a state court should be the one to grant it, the Department is entitled to a preliminary injunction.

## JURISDICTIONAL STATEMENT

The district court denied the Department's motion for a preliminary injunction on August 13, 2025. DE37:2.[1] The Department timely filed a notice of appeal on August 15, 2025. DE38:1–2. Accordingly, this Court has jurisdiction to review the denial of the Department's motion for a preliminary injunction under 28 U.S.C. § 1291(a)(1).

As the Department will further explain in its forthcoming response to a jurisdictional question issued by this Court, Dkt. 14-2, this Court also has jurisdiction to review the subject-matter jurisdiction of the district court and the denial of the

---

[1] References to the record are by district court docket entry number (e.g., DE37). The page number from the district court's electronic filing system follows the colon.

Department's remand motion both as part of its independent obligation to consider jurisdiction and as part of its pendent appellate jurisdiction. *See Cuban Am. Bar Ass'n v. Christopher*, 43 F.3d 1412, 1422–24 (11th Cir. 1995); *MacGinnitie v. Hobbs Grp.*, 420 F.3d 1234, 1241 (11th Cir. 2005); *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1335 (11th Cir. 1999); *Williams v. Boehrer*, 530 F. App'x 891, 896 (11th Cir. 2013). The District Court lacks subject-matter jurisdiction under the federal officer removal statute and should have granted the Department's motion to remand. Snap has not acted under a federal officer nor is its violation of HB3 related to any action that it possibly took under color of federal office. *See* 28 U.S.C. § 1442(a)(1).

## STATEMENT OF THE ISSUES

1. Whether the district court has federal officer jurisdiction because two federal agencies ran a handful of advertisements on Snapchat that have nothing to do with the Department's state law enforcement claims against Snap.

2. Whether the district court erred when it denied the Department's motion to preliminarily enjoin Snap's ongoing violations of HB3 on the ground that HB3 violates the First Amendment as applied to Snap.

## STATEMENT OF THE CASE

### Children and Social Media

Something has gone horribly wrong in the lives of American children and teenagers. Social media use has skyrocketed in recent years. Among 13- and 14-year-olds social media use rose from 47 percent to 78 percent between 2008 and 2017.

4

DE24-5:98. An astonishing 11 percent of eighth grade girls reported using social media for more than nine hours a day between 2018 and 2023. *Id.* And by 2023, American teens spent an average of 4.8 hours a day on social media. *Id.*

Meanwhile, the mental health of American children and teens has spiraled. Depression increased by 132 percent among teen girls and 134 percent among teen boys between 2011 and 2022. DE24-5:99. Emergency room admissions for self-harm increased by an astronomical 411 percent among 10- to 14-year-old girls between 2010 and 2022. DE24-5:100. And suicides increased by 166 percent among 10- to 14-year-old boys and 217 percent among 10- to 14-year-old girls between 2010 and 2022. DE24-5:101. "If the suicide rate had stayed at its 2007 low, 3,604 more American 10- to 14-year-olds would be alive today." *Id.*

The rise in social media use may have displaced "other activities more beneficial for mental health." DE24-5:102. Notably, more than half of 10- to 18-year-olds are not sleeping for the recommended minimum number of hours. DE24-5:125. Teens are on their smartphones in the hour before bed and once they are in bed but have yet to fall asleep. DE24-5:126. Snapchat is one of the most popular apps that teens use during that time. *Id.* "A child who is engaging with social media in bed is postponing or delaying sleep." DE24-5:128. And children and teens "who leave their ringers on at night are more likely to have trouble falling/staying asleep and greater risk of sleep disturbance." DE24-5:129. Indeed, the "simple presence of a mobile device in a young person's bedroom is associated with a 79% increased risk of inadequate sleep duration." DE24-

5:130.

This effect on sleep carries serious health consequences. "[S]creen use is associated with worse sleep health, in terms of later falling asleep, shorter sleep duration, and worse sleep quality." DE24-5:128. Sleep deprivation "causes short-term harm to accuracy and speed of task performance, decision making, mood, and physiological well-being." DE24-5:123. In contrast, "improving sleep cause[s] better mental health, less depression, less anxiety, less rumination, less stress, and fewer psychosis symptoms." DE24-5:124.

As the negative effects of social media grew, a 2023 advisory from the U.S. Surgeon General explained that the "current body of evidence indicates . . . that social media can . . . have a profound risk of harm to the mental health and well-being of children and adolescents." DE24-5:30. "Adolescent social media use is predictive of a subsequent decrease in life satisfaction for certain developmental stages including for girls 11–13 years old and boys 14–15 years old." DE24-5:31. The "adolescents who spent more than 3 hours per day on social media faced double the risk of experiencing poor mental health outcomes including symptoms of depression and anxiety." DE24-5:32.

Compulsive social media use is akin to other behavioral addictions. The Surgeon General's advisory noted that "some researchers believe that social media exposure can overstimulate the reward center in the brain and, when the stimulation becomes excessive, can trigger pathways comparable to addiction." DE24-5:35. For example,

studies "have shown that people with frequent and problematic social media use can experience changes in brain structure similar to changes seen in individuals with substance use or gambling addictions." *Id.*

The adolescent brain is especially susceptible to the deleterious effects of social media. Early adolescence is "when identities and sense of self-worth are forming, [and] brain development is especially susceptible to social pressures, peer opinions, and peer comparison." DE24-5:31. "Frequent social media use may be associated with distinct changes in the developing brain in the amygdala (important for emotional learning and behavior) and the prefrontal cortex (important for impulse control, emotion regulation, and moderating social behavior), and could increase sensitivity to social rewards and punishments." *Id.*

The Surgeon General's advisory also called into question the use of certain addictive features by social media platforms. It explained that "[s]ocial media platforms are often designed to maximize user engagement, which has the potential to encourage excessive use and behavioral dysregulation." DE24-5:35. Notably, "[p]ush notifications, autoplay, infinite scroll, quantifying and displaying popularity (i.e., 'likes'), and algorithms that leverage user data to serve content recommendations are some examples of these features." *Id.* The Surgeon General's advisory concluded by calling on state policymakers to "protect children and adolescents from risk of harm" by "implement[ing] protections for our children and adolescents" including "limiting the use of features that attempt to maximize time, attention, and engagement." DE24-5:39,

41.

## Florida Enacts HB3

Bipartisan supermajorities of the Florida legislature answered the Surgeon General's call in 2024 and enacted HB3. H.B. 3, 2024 Leg., Reg. Sess. (Fla. 2024) (codified in relevant part at FLA. STAT. § 501.1736). HB3 requires qualifying "social media platform[s]" to "prohibit a minor who is younger than 14 years of age from entering into a contract with" the platform "to become an account holder" and to "[t]erminate any account held by an account holder younger than 14 years of age." FLA. STAT. § 501.1736(2)(a)–(b)(1). It also requires a qualifying social media platform to "prohibit a minor who is 14 or 15 years of age from entering into a contract with a social media platform to become an account holder, unless the minor's parent or guardian provides consent" and to "[t]erminate any account held by an account holder who is 14 or 15 years of age . . . if the account holder's parent or guardian has not provided consent." *Id.* § 501.1736(3)(a)–(b)(1). HB3 authorizes the Office of the Attorney General's Department of Legal Affairs to bring civil actions to enforce HB3 against qualifying social media platforms. *Id.* § 501.1736(5)

A qualifying "[s]ocial media platform" is one with all of the following characteristics: (1) it "[a]llows users to upload content or view the content or activity of other users"; (2) "[t]en percent or more of [its] daily active users who are younger than 16 years of age spend on average 2 hours per day or longer on the . . . application on the days when using the . . . application"; (3) it "[e]mploys algorithms that analyze user

data or information on users to select content for users"; and (4) it has at least one of five "addictive features," defined as "[i]nfinite scrolling," "[p]ush notifications or alerts," "[a]utoplay," "[l]ive-streaming," or "personal interactive metrics that indicate the number of times other user have clicked a button to indicate their reaction to content or have shared or reposted the content." *Id.* § 501.1736(1)(e). Qualifying social media platforms do not include services for which the "exclusive function is e-mail or direct messaging . . . shared only between the sender and the recipients, without displaying or posting publicly or to other users not specifically identified as the recipients." *Id.*

### Snap Violates HB3

Snap operates the Snapchat social media platform, which is enormously popular among Florida teenagers. *See* DE24-5:57–59; DE24-5:125–26; DE24-5:184. Snapchat satisfies the four requirements to fall within HB3's scope: Snapchat "allows users to upload content or view the content or activity of other users"; more than 10 percent of its daily active users "who used Snapchat at least 80 percent of the days during the previous 12 months and who are younger than 16 years of age spent on average 2 hours per day or longer on Snapchat" on days that they used it; Snapchat uses "algorithms to show users content that may be particularly relevant to them based in part on the content they have interacted with in the past"; and Snapchat has four of the five "addictive" features that HB3 targets. DE24-5:183–84; *see* FLA. STAT. § 501.1736(1)(e); DE24-5:70–72, 75–76, 78–80.

9

Snap's use of four addictive features is especially pernicious. First, Snap uses infinite scrolling, which eliminates natural stopping cues and causes users to "spend much more time on their phone than they originally intended." DE24-5:71–72. "Snap maintains this feature of its platform even though an internal Snap document lists '[r]emov[ing] the infinity scroll' as among the top ideas for how to improve the wellness of Snap users." DE24-5:72.

Second, Snap uses push notifications, which "exploit users' natural tendency to seek and attend to environmental feedback, serving as distractors that monopolize attention." *Id.* It is "almost impossible" for many users to resist push notifications, and research indicates that push notifications "can increase levels of inattention and hyperactivity, while simultaneously lowering productivity and psychological wellbeing, mimicking symptoms of ADHD even in individuals without clinical diagnoses." DE24-5:73. An internal Snap document identified constant use as the "[t]op negative" of social media and suggested "giving [u]sers the power to turn off notifications during school hours or when they should be working or studying" to address that overuse problem. DE24-5:75.

Third, Snap uses personal interactive metrics, which activate parts of the brain associated with reward processing by providing a form of instantaneous feedback that has "been identified as a contributor to the development of habitual behavior." DE24-5:67. Among other personal interactive metrics, Snapchat shows users "Snapstreaks" which are essentially a running tally of the number of consecutive days that two users

10

have sent each other messages. DE24-5:76 & n.92. "Presented with data showing how Snapstreaks drive user engagement, one Snap employee commented: 'Wow, we should have more addicting features like this.'" DE24-5:78.

Fourth, Snapchat automatically plays videos, which pushes users to "stay engaged without any further effort." DE24-5:79. This feature exploits the psychology of behavioral addiction to keep users on the platform for extended periods. DE24-5:73–74. Unfortunately for Florida teens, the sum of these four addictive design features is even worse than each part: "The combined force of multiple addictive features operating at once ensures that social media platforms [such as Snapchat] function to continuously siphon users' time and cognitive resources." DE24-5:81–82.

Shortly before HB3 was set to take effect on January 1, 2025, a trade association that represents Snap and other social media companies sued the Attorney General in federal district court seeking preliminary and permanent injunctions against enforcement of the law based on the First Amendment. To facilitate a briefing schedule that would permit discovery and the development of a record, the Attorney General agreed not to enforce HB3 until the district court ruled. On March 17, 2025, the district court dismissed the trade association's complaint without prejudice for lack of standing. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 770 F. Supp. 3d 1317, 1319 (N.D. Fla. Mar. 17, 2025).

The Attorney General's Office then began investigating HB3 compliance and determined that Snap is openly violating the law. When a new user in Florida tells Snap

that the user is 13 years old as part of the account registration process, Snap contracts with the user and allows the user to create an account. DE24-5:188. Similarly, when a new user in Florida tells Snap that the user is 15 years old, Snap contracts with the user and allows the user to create an account without parental consent. DE24-5:189.

### The Department's Action Against Snap

As a result of these findings, the Department filed this action against Snap in Florida state court and alleged that Snap contracts with minors under the age of 14 and between the ages of 14 and 15 without parental consent in violation of HB3. DE24-1:34. The Department sought, among other things, injunctive relief, civil penalties, and punitive damages. DE24-1:36–37. The Department also moved for a preliminary injunction. DE27.

Snap then filed a notice of removal in the Northern District of Florida. DE1:1. Snap alleged that the district court had jurisdiction under the federal officer removal statute, DE1:12, which permits a private person "acting under" an "officer . . . of the United States or of any agency thereof" to remove a civil action to federal court if the action is "for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). Snap argued that Section 1442(a)(1) applied because the Department of Homeland Security ("DHS") and Food and Drug Administration ("FDA") placed advertisements on Snapchat, and HB3 would prevent minors between the ages of 13 and 15 from viewing those advertisements. DE1:14–16, 18–19.

The Department moved to remand for lack of subject-matter jurisdiction. DE14.

Snap then produced the terms of its agreements with DHS and the FDA, which revealed that Snap was merely a contractual service provider, DE23-1:5; DE23-9:3; DE23-10:3–4, that DHS and the FDA delegated no legal authority to Snap, DE23-7:5; DE23-9:4, that DHS and FDA exercised no control over Snap's actions, DE23-7:11–12; DE23-9:5, and that Snap had no authority under the agreements to violate applicable law including HB3, DE23-7:5, 11; DE23-9:4; DE23-10:5. Accordingly, the Department argued that Snap failed to establish the "requisite subjection, guidance, and control" necessary to establish that it acted under a federal officer. DE34:4. The Department also argued that Snap did not act under color of federal office because there is no connection between its use of addictive features and contracts with minors in violation of HB3 and the advertisements it hosted for DHS and the FDA. DE34:7–10.

Meanwhile in the trade association's federal action against the Attorney General, the trade association filed an amended complaint and renewed its motion for a preliminary injunction on First Amendment grounds. *Comput. & Commc'ns Indus. Ass'n v. Uthmeier* (*CCIA*), No. 4:24-cv-00438-MW-MAF, 2025 WL 1570007, at *1 (N.D. Fla. June 3, 2025). By the time the district court ruled on that motion, the trade association's action and this one were both pending before the same district judge in the Northern District of Florida. Snap had notified the district court that two actions had the First Amendment issue in common. DE2:3. So the district court transferred this action to the district judge assigned to the trade association's action. DE7.

13

The district court then granted the trade association's preliminary-injunction motion on the ground that the trade association was likely to succeed on its challenge to HB3 under the First Amendment. *CCIA*, 2025 WL 1570007, at *1, *19. The Attorney General had argued that HB3 regulates only nonexpressive activity (i.e., the use of addictive features and the formation of contracts with minors) and that even if the First Amendment is implicated, HB3 is subject to and satisfies intermediate scrutiny. *Id.* at *11, *13. But the district court held that HB3 implicates the First Amendment, is subject to intermediate scrutiny because it is not content based, and fails that scrutiny. *Id.* at *12–19.

Although the district court purported to apply intermediate scrutiny, its determination that HB3 failed that scrutiny closely resembled strict scrutiny. *See id.* at *14–19. The district court faulted the Florida Legislature for enacting HB3 instead of "provid[ing] educational tools and resources for parents to learn how to" use parental control tools. *Id.* at *18. It also reasoned that the Florida Legislature cannot truly know whether excessive social media use results from addiction or simply a desire to engage with speech for multiple hours a day. *Id.* at *17. And it likened HB3 to the total social media ban at issue in *Packingham v. North Carolina*, 582 U.S. 98 (2017), even though HB3 protects only the most vulnerable minors (i.e., minors who are 15 and under) and only applies to platforms that use addictive features in combination with algorithms. *Id.* at *16.

Then, in this action, the district court denied the Department's motions to

14

remand and for a preliminary injunction. The district court ruled that it had subject-matter jurisdiction under Section 1442(a)(1) because enforcement of HB3 would "interfere with existing federal contracts designed to further the federal government's task of communicating information to youth in Florida." DE36:6–7. And it denied the preliminary-injunction motion solely based on its First Amendment ruling for the trade association. DE37.

## STANDARDS OF REVIEW

This Court reviews *de novo* issues of subject-matter jurisdiction that result from the denial of a remand motion. *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1283 (11th Cir. 2015). This Court reviews the denial of a preliminary injunction for abuse of discretion, but it reviews any underlying "legal conclusions *de novo* and factual findings for clear error." *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024).

## SUMMARY OF THE ARGUMENT

The Department's state-law enforcement action against Snap belongs in state court because the district court lacks subject-matter jurisdiction. Although this Court should vacate and remand with instructions to grant the Department's motion to remand, if it does not, it should instead conclude that the Department is likely to succeed on the merits because HB3 is consistent with the Free Speech Clause of the First Amendment and reverse the denial of the Department's preliminary-injunction motion.

15

I.   The federal officer removal statute is inapplicable, and the district court lacks subject-matter jurisdiction because Snap is nothing more than a contractual service provider that hosts advertisements for DHS and the FDA. *See* 28 U.S.C. § 1442(a)(1). Snap has not acted under a federal officer as required by Section 1442(a)(1) because DHS and the FDA have no control over Snap and Snap no authority to act on their behalf. Nor did Snap establish that it acted under a *specific* federal officer as required by the text of the Section 1442(a)(1). Snap's violation of HB3 is also unrelated to any action Snap possibly took under color of federal office because Snap's agreements with DHS and the FDA deprived it of any authority to violate applicable law including HB3.

II.   Although this Court should not go further, if it does, it should hold that HB3 as applied to Snap is consistent with the First Amendment. First, HB3 does not implicate the First Amendment. HB3 regulates Snap's ability to contract with certain minors because Snap uses addictive features and an algorithm that causes minors to compulsively use Snapchat. HB3 is thus a regulation of nonexpressive conduct that applies to Snap irrespective of any message expressed on the platform. Accordingly, it neither directly regulates nor disproportionately burdens expression. Second, even if HB3 did implicate the First Amendment, intermediate scrutiny would apply because HB3 is content agnostic as it does not turn on the message of any Snapchat post. And HB3 easily satisfies that standard because it furthers the compelling interest of protecting the physical and psychological wellbeing of minors in a way that is narrowly

tailored to Snapchat's addictive features and the minors most vulnerable to those features.

## ARGUMENT

### I.    The District Court Lacks Subject-Matter Jurisdiction and Erred When It Denied the Department's Motion to Remand.

Section 1442(a)(1) provides that a "civil action . . . that is commenced in a State court and that is against . . . [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof . . . for or relating to any act under color of such office" is removable to federal district court. 28 U.S.C. § 1442(a)(1). To carry its burden of proving federal jurisdiction, *see Leonard v. Enterprise Rent a Car*, 279 F.3d 967, 972 (11th Cir. 2002), a private entity must establish that (1) it "acted under a federal officer," (2) "it performed the actions for which it is being sued under color of federal office," and (3) it has a "colorable federal defense," *Caver*, 845 F.3d at 1142.

Snap cannot satisfy either of the first two requirements. First, Snap did not act under a federal officer because federal agencies did not delegate authority to Snap and closely supervise it when they placed advertisements on Snapchat. Second, even if Snap had acted under a federal officer with respect to those advertisements, Snap's actions are unrelated to the Department's HB3 claim against Snap. Accordingly, Section 1442(a)(1) does not supply jurisdiction in this case, and the district court erred when it denied the Department's motion to remand.

17

**A. Snap Did Not Act Under a Federal Officer.**

A private person "act[s] under" a federal officer for purposes of Section 1442(a)(1) if that person performs a governmental duty under the "close supervision" of the officer. *Id.* at 1143. The private person must "assist, or . . . help carry out, the duties or tasks of the federal superior." *Schleider v. GVDB Operations, LLC*, 121 F.4th 149, 158 (11th Cir. 2024) (quoting *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007)). "In other words, the private person must help federal officers fulfill a basic governmental task that the government otherwise would have had to perform." *Caver*, 845 F.3d at 1143. The "relationship between the private person and the federal [superior]" must also be "one of 'subjection, guidance, or control.'" *Id.* (quoting *Watson*, 551 U.S. at 151). But mere compliance with federal laws and regulations, "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored," does not suffice. *Schleider*, 121 F.4th at 159 (quoting *Watson*, 551 U.S. at 153).

This Court has twice held that a private person satisfied Section 1442(a)(1). *Caver*, 845 F.3d at 1142–44; *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1428 (11th Cir. 1996). First, this Court held in *Magnin v. Teledyne Continental Motors* that a private aircraft inspector satisfied Section 1442(a)(1) because he acted "in his capacity as an agent" of a federal officer when he signed an export certificate, performing statutory inspection and certification duties that the Federal Aviation Administrator delegated to him. 91 F.3d at 1428. Second, this Court held in *Caver v. Central Alabama Electric Cooperative* that

18

a rural electric cooperative acted under the federal agency statutorily charged with making loans to promote electrification of rural areas. 845 F.3d at 1138, 1143–44. As a loan recipient, the cooperative "work[ed] closely with [the agency] to fulfill the congressional objective of bringing electricity to rural areas" and did so while the agency exercised a "significant level of control over [the cooperative's] operations." *Id.* at 1143–44.

These relationships are akin to an agency relationship between a federal officer and private person. *See DeFiore v. SOC LLC*, 85 F.4th 546, 554 (9th Cir. 2023) ("[T]he relevant statutory language—'acting under'—is redolent of common-law agency."). The requirement that a defendant perform the "duties or tasks of the federal superior" under the superior's "subjection, guidance, or control," *Watson*, 551 U.S. at 151–52 (citation and internal quotation marks omitted), mirrors the role of an agent who "act[s] on the principal's behalf and subject to the principal's control," Restatement (Third) of Agency § 1.01 (A.L.I. 2006). That Section 1442(a)(1) applies only to claims "for or relating to any act under color of [the federal superior's] office," 28 U.S.C. § 1442(a)(1), further mirrors an agency relationship in which the agent's actual authority is limited to "acts necessary or incidental to achieving the principal's objectives, as the agent reasonably understands the principal's manifestations and objectives," Restatement (Third) of Agency § 2.02(1) (A.L.I. 2006); *see also Watson*, 551 U.S. at 150 (describing the "statute's 'basic' purpose" as "protect[ing] the Federal Government from the interference with its 'operations' that would ensue were a State able, for example," prosecute "'*officers and*

19

*agents*' of the Federal Government 'acting . . . *within the scope of their authority*'" (emphasis added) (citation omitted)).

Like an agency relationship, which does not exist simply because "one person provides services to another," Restatement (Third) of Agency § 1.01 cmt. c (A.L.I. 2006), a mere contract for "goods and services is insufficient to satisfy the federal officer removal statute," *Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021). Accordingly, the Supreme Court described as the "fatal flaw" in a private entity's removal argument the lack of "evidence of any delegation of legal authority" to act "on the Government agency's behalf." *Watson*, 551 U.S. at 156. And, for example, the Ninth Circuit has held that a private entity that "agreed to store and destroy fireworks that had been seized by the federal government" did not act under a federal officer or agency because there was no evidence that of the "requisite federal control or supervision over the handling of the seized fireworks." *Cabalce v. Thomas E. Blanchard & Assocs.*, 797 F.3d 720, 723, 728 (9th Cir. 2015). The "contractor was [merely] a *nonagent* service provider." *DeFiore*, 85 F.4th at 556 (citation and internal quotation marks omitted).

Snap did not act under any federal officer within the meaning of Section 1442(a)(1) when the FDA and DHS ran advertisements on Snapchat. The FDA purchased advertisements on Snapchat through a marketing agency, with the campaign subject to the same terms that apply to all advertisers who pay for ads on Snapchat. DE23-1:3, 5. Those terms expressly state that they "do not establish any agency,

20

partnership or joint venture between [the advertiser] and Snap." DE23-7:11. And the free advertising that Snap provides DHS about the risks of online sexual exploitation is governed by a Memorandum of Understanding ("MOU") that "shall not be construed to create any legal obligation on the part of either party," and that "[n]o agent or employee of any Party shall be deemed to be an agent or employee of any other Party." DE23-9:5. By the express terms of these agreements, Snap was not an agent of either agency and thus not authorized to act on behalf of the agencies nor subject to their control. *Cf. Caver*, 845 F.3d at 1143; *Magnin*, 91 F.3d at 1428. The lack of control alone is sufficient to conclude that Snap did not act under DHS or the FDA. *See Caver*, 845 F.3d at 1143 (requiring a "significant level of control" and "assist[ance] . . . with accomplishing [an agency's] duties or tasks").

Snap also did not carry out the statutory duties of DHS or the FDA in those agencies' stead. The terms of the agreements between Snap and the agencies expressly negate any notion that Snap would carry out these advertising campaigns for the agencies. Specifically, the terms that governed the FDA's relationship with Snap stated that "Snap will not be a sponsor or administrator of [the FDA's] Promotion." DE23-7:4. And the MOU between Snap and DHS stated that it did not "limit or affect in any way the authority or legal responsibilities of DHS." DE23-9:4. Snap simply "[p]rovid[ed] advertising credit on the Snapchat app" to DHS, DE23-9:3; DE23-10:3, and the FDA, through a marketing agency, "placed [an ad] campaign order through the FDA's account on Snap's self-service advertising platform," DE23-1:5. To be sure, the

21

agencies exercised their own statutory authority when they ran the advertisements. *See* 6 U.S.C. § 473(b)(2)(F) (authorizing DHS's Child Exploitation Investigations Unit to "collaborate with . . . nongovernmental . . . entities . . . for the sponsorship of, and participation in, outreach and training activities"); 21 U.S.C. § 393(d)(2)(D) (authorizing the Commissioner of Food and Drugs to "conduct[] educational and public information programs relating to the responsibilities of the [FDA]"). But unlike *Magnin*, where the relevant statute expressly authorized a delegation of authority, 91 F.3d at 1428, and unlike *Caver*, where the cooperative "provide[d] a public function conceived of and directed by the federal government," 845 F.3d at 1144, Snap was merely a contractual service provider for DHS and the FDA when it allowed the agencies to place ads on Snapchat.

For its part, the district court erred when it watered down the "acting under" requirement with its fixation on liberal construction. DE36:6–8. Although the Supreme Court has called for a liberal construction to "give full effect" to the statute, *Symes*, 286 U.S. at 517, it has also cautioned that the statute is "not limitless," *Watson*, 551 U.S. at 147, and called for it "to be construed with highest regard" for the "right of the states . . . to make and enforce their own laws . . . equal to the right of the federal government to exert exclusive and supreme power in the field that by virtue of the Constitution belongs to it," *Symes*, 286 U.S. at 518.

The district court's liberal construction would permit any provider of services to the federal government to remove under Section 1442(a)(1). The district court failed to

distinguish a mere contract for goods or services, *see Express Scripts Pharmacy*, 996 F.3d at 251, from "fulfill[ing] a basic governmental task that the government otherwise would have had to perform," *Caver*, 845 F.3d at 1143. In the district court's view, anything that helps an agency "accomplish[] [its] statutory responsibilities" is sufficient. DE36:7. That view would supply federal jurisdiction whenever a private person provides a good or service to the federal government. The district court also conflated *collaboration* with "subjection, guidance, or control" when it concluded that meetings between the FDA and Snap about the effectiveness of the FDA's advertising campaign and an exchange of research between Snap and DHS meant that Snap was under those agencies' control. DE36:8. That view would similarly supply federal jurisdiction whenever a private person works alongside the federal government. This construction is a limitless one, not just a liberal one.

Finally, Snap cannot satisfy Section 1442(a)(1)'s "acting under" requirement for another and fully independent reason: it failed to establish "that it is acting under a specific *officer* of the United States or one of its agencies." *DeFiore*, 85 F.4th at 562 (Collins, J., dissenting). Although Section 1442(a)(1) references the "United States" and "agencies thereof," it unambiguously authorizes a private person to remove an action only if the private person was "acting under *that officer*," which can be read to refer only to "*any officer . . . of* the United States or *of* any agency thereof." 28 U.S.C. § 1442(a)(1) (emphasis added). "Accordingly, it is *not* sufficient for a private 'person' invoking this statute to simply assert that he or she is acting, in some general sense, under the 'United

States' or an 'agency thereof.'" *DeFiore*, 85 F.4th at 562 (Collins, J., dissenting). So Snap's attempt to invoke Section 1442(a)(1) also fails because Snap has produced nothing more than evidence that it entered advertising contracts with federal agencies rather than acting under a specific officer. *See* DE23-1:5; DE23-9:3; DE23-10:3–4.[2]

**B. The Department's Claims Against Snap Are Unrelated to Any Action that Snap Conceivably Took Under Color of Federal Office.**

Even if Snap could establish that it acted under a federal officer when DHS and the FDA placed advertisements on Snapchat, Snap's actions with respect to those advertisements are unrelated to the Department's claims against Snap.

Section 1442(a)(1) requires a private person to establish a "causal connection between what the [private person] has done under asserted official authority and the action against him." *Caver*, 845 F.3d at 1142 (quoting *Magnin*, 91 F.3d at 1427). Although this Court has described the "phrase 'relating to'" in Section 1442(a)(1) as "broad" and one that "requires only a connection or association between the act in question and the federal office," the act done under color of federal office must still "form[] the basis" of the claim against the defendant to support removal. *Id.* at 1144 (citation and some internal quotation marks omitted). To permit removal based on a "*single* allegation" that

---

[2] To the extent that this Court's decision in *Caver* could be read not to require that the private party invoking federal officer jurisdiction act under a *specific* officer, it is inconsistent with the statute's text and the Court's earlier decision in *Magnin. See Magnin*, 91 F.3d at 1428 (finding federal officer jurisdiction because private defendant acted under the Federal Aviation Administrator). *Magnin* controls under the prior-panel-precedent rule. *See United States v. Tovar*, 146 F.4th 1318, 1324–25 (11th Cir. 2025).

relates to "official duties would run contrary to both the removal statute and precedent." *State v. Meadows*, 88 F.4th 1331, 1345 (11th Cir. 2023). This Court instead "[l]ook[s] to the heart" of the complaint because "the 'act' anchoring removal must be defined by the 'claim' brought against the defendant." *Id.* at 1344. This focus on the heart of the claim accords with the origins of Section 1442(a)(1), which arose "out of the view that because the defendant's federal employment presumably demanded the performance of the act in controversy, the defendant is entitled to a forum sympathetic to and understanding of the governmental working relationship in question." 14C WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 3726 (rev. 4th ed., May 2025 update).

This Court insists on significant overlap between potential liability and official acts to satisfy Section 1442(a)(1)'s causal requirement. For example, in *State v. Meadows*, this Court held that the requisite causal connection was absent where the defendant was charged with "conspiring to 'unlawfully change the outcome of the election'" because he "had no official authority to operate" on behalf of a political campaign. 88 F.4th at 1345, 1349. Without an official role that "include[d] altering valid election results in favor of a particular candidate," there was "no 'causal connection' between [the defendant's] 'official authority' and his alleged participation in the conspiracy." *Id.* at 1349 (quoting *Willingham v. Morgan*, 395 U.S. 402, 409(1969)).

The Department's claim under HB3 against Snap is divorced from any of Snap's actions related to DHS and the FDA advertisements. The Department alleges that HB3

applies to Snap because it has voluntarily adopted certain addictive features (e.g., infinite scrolling and auto-play video). DE24-1:8, 12–15, 34; *see* FLA. STAT. § 501.1736(1)(e). Snap's agreements with DHS and the FDA do not require Snap to use addictive features and contract with 13-year-old children or 14- and 15-year-olds without parental consent to accomplish the agencies' advertising objectives. Quite the opposite. Snap's MOU with DHS states that Snap "shall comply with all applicable laws, rules, and regulations, whether now in force or hereafter enacted or promulgated," which includes HB3, and further states that its terms "are not intended to alter, amend, or rescind any provisions of Federal or state law." DE23-9:4; DE23-10:5. Similarly, the terms that govern Snap's relationship with the FDA state that "Snap will not be required to act, or abstain from action, if such action or abstention would violate Applicable Law, which includes "applicable laws, statute, ordinances, . . . and regulations" like HB3. DE23-7:4, 11. As in *Meadows*, where the defendant "had no official authority to operate" on behalf of a political campaign, 88 F.4th at 1349, Snap's advertising agreements deprive it of any authority to violate HB3 when hosting the agencies' advertisements, let alone require or encourage Snap to do so. So Snap's violation of HB3 is necessarily unrelated to any actions Snap took with respect to the agencies' advertising campaigns.

In reaching the opposite conclusion, the district court overlooked precedent and misapprehended the evidence. Not once did the district court acknowledge that this Court explained in *Caver* that acts under color of federal office must "form[] the basis of [the plaintiff's] claims." 845 F.3d at 1144. That oversight caused the district court to

mistakenly conclude that "hinder[ing]" the government's advertising objectives by reducing the size of the audience for the advertisements was sufficient to satisfy the causal requirement. The district court also incorrectly stated that the "federal government has asked Snap to distribute its messages to youth in Florida between the ages of 13 and 17, including in the form of 'Commercials' *that auto-play for the user* and cannot be skipped." DE36:12 (emphasis added). But Snap produced no evidence that the federal government directed it to use such features when running the advertisements. *See* DE23-1:2–3; DE23-9:3; DE23-10:3–4.

*    *    *

The district court lacks subject-matter jurisdiction both because Snap did not act under a federal officer and because any actions Snap took with respect to the advertisements are unrelated to the Department's HB3 claim. This Court should instruct the district court to grant the Department's motion to remand to return this action to its rightful forum: Florida state court.

## II.   HB3 Is Consistent with the First Amendment, so the District Court Erred When It Denied the Department's Preliminary Injunction Motion.

Although the Court should not reach this issue because the district court lacks subject-matter jurisdiction, the district court also erred when it concluded that the Department is unlikely to succeed on the merits and denied the Department's motion for a preliminary injunction. Snap is openly violating HB3. *See* FLA. STAT. § 501.1736(2)(a), (3)(a); DE24-5:188–89. Contrary to the district court's conclusion,

HB3 as applied to Snap is consistent with the First Amendment because it does not implicate the First Amendment in the first place. But, even if it did, intermediate scrutiny would apply and HB3 easily satisfies that standard.

## A. HB3 as Applied to Snap Does Not Implicate the First Amendment.

The Supreme Court has identified two kinds of laws that can trigger First Amendment scrutiny: (1) "[l]aws that directly regulate expressive conduct" or "'conduct that has an expressive element,'" and (2) "'some statutes which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities.'" *TikTok Inc. v. Garland*, 604 U.S. 56, 67–68 (2025) (quoting *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 703–04 (1986)). HB3 does neither, so it does not trigger First Amendment scrutiny.

The First Amendment protects "only . . . conduct that is inherently expressive." *Rumsfeld v. FAIR, Inc.*, 547 U.S. 47, 66 (2006); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 745 (2024) (Barrett, J., concurring). Conduct is inherently expressive if the person engaged in it intends to convey a message and a "reasonable person would interpret" it as conveying "*some* sort of message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)). This line exists to ensure that "every restriction of expression incidentally produced by a general law regulating conduct" need not face First Amendment scrutiny; the First Amendment is concerned only with conduct that the "government prohibits . . . *precisely because of its communicative attributes.*"

28

*Barnes v. Glen Theatres, Inc.*, 501 U.S. 560, 576–77 (1991) (Scalia, J., concurring in the judgment).

The "First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Laws that regulate commerce or conduct do not offend the First Amendment even when applied to businesses whose core activities are expressive. For example, in *Arcara v. Cloud Books, Inc.*, the Supreme Court held that the closure of an adult bookstore that was the "inevitable" result of the enforcement of a public nuisance statute that prohibited facilitating prostitution did not implicate the First Amendment. 478 U.S. at 698, 706–07. Accordingly, social media platforms might be "engaged in expressive activity when performing one function," but they might not be "when carrying out another" and thus not protected by the First Amendment. *Moody*, 603 U.S. at 732 n.4 (majority opinion).

This Court has consistently held that laws that prohibit minors from accessing businesses that host expressive activity because of a nonexpressive feature of the business do not implicate the First Amendment. *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1299–1300 (11th Cir. 2013); *Gary v. City of Warner Robbins*, 311 F.3d 1334, 1340 (11th Cir. 2002). In *Indigo Room, Inc. v. City of Fort Meyers*, an ordinance that prohibited admitting minors to establishments that serve alcohol "d[id] not reach constitutionally protected conduct" when applied to a bar that hosted a political event because the "text of the [o]rdinance d[id] not regulate speech." 710 F.3d at 1299–1300.

29

And in *Gary v. City of Warner Robbins*, an ordinance that restricted persons under 21 from entering establishments that sell alcohol did not infringe the First Amendment right of a nude dancer who was under 21 and wished to work in such establishments. 311 F.3d at 1336, 1340. The dancer was "free to observe and engage in nude dancing, but . . . simply [could] not do so . . . in establishments that primarily derive their sales from alcoholic beverages consumed on the premises." *Id.* at 1340.

This Court has also explained how to analyze regulations of conduct that depend on the satisfaction of certain conditions. *See Honeyfund.com v. Gov. of Fla.*, 94 F.4th 1272, 1278 (11th Cir. 2024). This Court "ask[s] whether enforcement authorities must examine the content of the message that is conveyed to know whether the law has been violated" to "reliabl[y]" identify regulations of expression disguised as regulations of conduct. *Id.* (quoting *Otto v. City of Boca Raton*, 981 F.3d 854, 862 (11th Cir. 2020)). "When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Id.* So, in *Honeyfund.com v. Governor of Florida*, this Court held that a prohibition on mandatory employee meetings that applied only "when those meetings include[d] speech endorsing certain ideas" was a regulation of speech because the "conduct and the speech [we]re so intertwined, regulating the former mean[t] restricting the latter." *Id.*

HB3 does not "directly regulate" expressive conduct or conduct with an expressive element. *TikTok*, 604 U.S. at 67–68. It is a conditional regulation of nonexpressive conduct because it prohibits Snap from contracting with certain minors

while Snap uses an algorithm and addictive features that cause minors to spend excessive time on Snapchat to the detriment of their mental health. *See* FLA. STAT. § 501.1736(1)(e), (2)(a), (3)(a). HB3's "text . . . does not regulate speech." *Indigo Room*, 710 F.3d at 1300. It regulates contracting for a Snapchat account. That conduct is not "inherently expressive," *FAIR*, 547 U.S. at 66, because a reasonable observer would not understand the mere act of contracting for a Snapchat account to convey "*some* sort of message," *Food Not Bombs*, 901 F.3d at 1240 (quoting *Holloman*, 370 F.3d at 1270). Contracting for a Snapchat account is nothing like the burning of the draft card in *United States v. O'Brien*, which itself conveyed a message of "demonstration against the war and against the draft." 391 U.S. 367, 376 (1968). So the district court erred from the jump when it concluded that contracting for a social media account is conduct with an expressive element. *CCIA*, 2025 WL 1570007, at *12.

Nor does HB3 disproportionately burden any expression. A law imposes a disproportionate burden on expression if despite regulating nonexpressive activity, it is "aimed" at expression, *see Arcara*, 478 U.S. at 707, or rather, it "functionally" regulates expression, *Honeyfund.com*, 94 F.4th at 1278. Otherwise, the law only incidentally burdens expression, and heightened scrutiny does not apply. *See Arcara*, 478 U.S. at 707; *Sorrell*, 564 U.S. at 566–67. Any burden that HB3 imposes on expression is at most incidental.

This Court's decisions in *Indigo Room* and *Gary* are instructive. Just as the establishments in *Indigo Room* and *Gary* could have avoided any limitation on the

31

expressive activity of minors if they chose not to sell alcohol, minors between the ages of 13 and 15 could freely make Snapchat accounts if Snap simply stopped using the addictive features or an algorithm. *See Indigo Room*, 710 F.3d at 1299–1300; *Gary*, 311 F.3d at 1336, 1340. Even more, the political speech at issue in *Indigo Room* received the First Amendment's "fullest and most urgent application," *Citizens United v. FEC*, 558 U.S. 310, 339 (2010) (quoting *Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)), yet even that fact did not change that the regulation of a business's nonexpressive choices does not implicate the First Amendment, *Indigo Room*, 710 F.3d at 1300.

The Supreme Court, for its part, examined whether laws imposed a disproportionate burden in *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983), and *Arcara*. In *Minneapolis Star*, the Court held that a tax on the "cost of paper and ink products consumed in the production of a publication," which "singl[ed] out publications for treatment that [wa]s . . . unique in Minnesota tax law," imposed a disproportionate burden. 460 U.S. at 577, 581. But the Court also noted that it is "beyond dispute" that the newspapers are not exempt from all "economic regulations." *Id.* at 581. And in *Arcara*, the Court held that the "fact that [the seller of adult books] remain[ed] free to sell the same materials at another location" "mitigated" any burden that the prohibition on facilitating prostitution inflicted on the bookseller's First Amendment activity. 478 U.S. at 705.

32

Here too any burden HB3 imposes is easily avoided without impacting expression. Unlike the tax on paper and ink, which could not be avoided without ceasing to engage in the expressive activity of printing newspapers, *see Minneapolis Star*, 460 U.S. at 577, Snap can cease its use of addictive features or algorithm—nonexpressive product design choices—and avoid any potential burden on expression. In other words, there is a "causal step[]" between HB3 and any burden on expression: Snap's use of addictive features. *TikTok*, 604 U.S. at 69.

It bears repeating that HB3 does not target, or "focus" on, any expression because it applies without regard to the nature of any message on Snapchat. *Cf. TikTok*, 604 U.S. at 69. That fact makes HB3 different from other regulations of conduct that the Supreme Court has scrutinized because they functioned as regulations of underlying messages. *See, e.g., Sorrell*, 564 U.S. at 571 (explaining that a hypothetical "law prohibiting trade magazines from purchasing or using ink" would "justify application of heightened scrutiny" because it "imposes a speaker- and content-based burden on protected expression"); *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 789, 799 (2011) (holding that a ban on the sale of violent video games to minors was subject to heightened scrutiny because it "imposes a restriction on the content of protected speech").

Nor do the conditions that trigger HB3's application to Snap function as a regulation of Snap's expression. *Cf. Honeyfund.com*, 94 F.4th at 1278. First, because a single addictive feature is sufficient to trigger HB3, *see* FLA. STAT. § 501.1736(1)(e)(4), if any one of Snapchat's addictive features is nonexpressive, this condition does not

trigger the First Amendment. And at least two of Snap's addictive features are plainly nonexpressive: infinite scrolling and autoplay. Infinite scrolling, which displays an "endless stream" of content, and autoplay video, "where one video automatically leads to the next," are mere reflections of a user's own activity that entice users to continue engaging with Snapchat, whether they are watching puppy videos or suggestive dance videos. DE24-5:71, 78. As content agnostic features, they convey no message, nor would a reasonable Snapchat user understand them to do so. *See Food Not Bombs*, 901 F.3d at 1240. They are product design choices that exploit the psychology of behavioral addiction and keep users on the platform as long as possible regardless of the content they see. DE24-5:70–71.

Second, Snapchat's algorithm, which is a mere reflection of user behavior, is also nonexpressive, so HB3 does not implicate the First Amendment as applied to Snap for that reason either. *See* FLA. STAT. § 501.1736(1)(e)(3). The "more an algorithm implements human editorial directions, the more likely it is to be expressive for First Amendment purposes." *NetChoice, LLC v. Bonta*, No. 25-146, ___ F.4th ___, 2025 WL 2600007, at *7 (9th Cir. Sep. 9, 2025). Snapchat uses an algorithm to "surface[]" videos "based on user interests and engagement." DE24-5:68. Snap's algorithm thus does not "help [it] identify and delete . . . content" that "human beings" at Snap have "decide[d] to remove." *Moody*, 603 U.S. at 745–46 (Barrett, J., concurring). And it does not reflect "human beings' inherently expressive choice 'to exclude a message [they] did not like from' their speech compilation." *Id.* at 746 (quoting *Hurley v. Irish-Am. Gay,*

34

*Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995)). Snap's algorithm "just presents automatically to each user whatever the algorithm thinks the user will like— *e.g.*, content similar to posts with which the user previously engaged." *Id.* No human being makes an expressive choice when Snap uses this kind of algorithm because the content that it feeds users is just a mirror of whatever they have previously viewed.

Third, HB3 does not trigger the First Amendment simply because it applies to Snap for operating a social media platform that "[a]llows users to upload content or view the content or activity of other users." FLA. STAT. § 501.1736(1)(e)(1). To be clear, this condition of HB3 does not ask whether Snap "construct[s] certain feeds" and "make[s] choices about what third-party speech to display and how to display it." *Moody*, 603 U.S. at 716 (majority opinion). Although those kinds of choices might be expressive, HB3 asks only *whether* Snap allows users to view the content or activity of others, not how or why. The hosting of myriad content from or activity of others on Snapchat does not itself reflect intent from Snap to convey a message, nor would a reasonable observer understand it to convey "*some* sort of message." *Food Not Bombs*, 901 F.3d at 1240 (quoting *Holloman*, 370 F.3d at 1270). A statute that applied to Snap because it moderated user content based on its own standards might implicate the First Amendment, but that statute *is not* HB3. To accept the district court's conclusion that the text of HB3 regulates speech simply because it applies to social media platforms would mean that *any* regulation of social media platforms triggers the First Amendment without regard for whether it regulates the messages expressed on those platforms. *See*

35

*CCIA*, 2025 WL 1570007, at *12. The law has never treated the First Amendment as so easily triggered. *Cf. Leathers v. Medlock*, 499 U.S. 439, 453 (1991) ("[D]ifferential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presents the *danger of suppressing, particular ideas*." (emphasis added)).

Fourth and finally, that HB3 applies to Snap because minors spend an excessive amount of time on the platform does not trigger the First Amendment either. *See* FLA. STAT. § 501.1736(1)(e)(2). As with HB3's other conditions, this condition is a content agnostic and applies regardless of what kinds of content users spend their time looking at on Snapchat. *Cf. Honeyfund*, 94 F.4th at 1278.

Because HB3 as applied to Snap neither directly regulates expressive conduct or conduct with an expressive element nor imposes a disproportionate burden on expression, it does not implicate the First Amendment.

## B. If HB3 Implicates the First Amendment, Intermediate Scrutiny Applies.

Were this Court to disagree and conclude that HB3 implicates the First Amendment, intermediate scrutiny would apply because HB3 is content neutral. *See TikTok*, 604 U.S. at 70. A law is content based and subject to strict scrutiny if it (1) facially "applies to particular speech because of the topic discussed or the idea or message expressed" or (2) "cannot be justified without reference to the content of the regulated speech or was adopted by the government because of disagreement with the message the speech conveys." *Id.* at 70–71 (internal quotation marks omitted) (quoting

36

*Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)). HB3 is content neutral because it applies to Snap without reference to the content of any post on Snapchat.

A content-based law turns on "what is said," *Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020), and requires speakers to "alter their . . . message" to comply. *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 655 (1994). So a "reliable way to tell if a law" is content based "is to ask whether enforcement authorities must 'examine the content of the message that is conveyed' to know whether the law has been violated." *Otto*, 981 F.3d at 862 (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014)). For example, laws that prohibit videos of animal abuse or bar doctors from asking patients about firearms are content based because "they regulate[] certain subject matters but not others." *Id.* Likewise, a regulation of robocalls was content based, not because it regulated robocalls, but because "authorities needed to know" whether the "call was about . . . collecting government debt" to determine if the regulation applied. *Id.* (citing *Barr v. Am. Ass'n of Pol. Consultants*, 591 U.S. 610 (2020)). Conversely, a regulation that "required bands using [a] city's outdoor stage to also use the city's sound system" was "'justified without reference to the content of the regulated speech'" because it "applied to all bands equally, and was not conditioned on the messages in songs or the political views of band members." *Id.* at 863 (quoting *Ward v. Rock Against Racism*, 591 U.S. 781, 791 (1989)).

HB3 as applied to Snap is facially content neutral and justified without reference to the content of speech on the platform. Application of HB3 to Snap turns on its use

of an algorithm, addictive features, and the facts that Snapchat "[a]llows users to upload content or view the content or activity of other users" and that minors spend a certain amount of time on the platform. FLA. STAT. § 501.1736(1)(e). None of these things has anything to do with a particular message. It makes no difference whether teens on Snapchat are scrolling through photos of OnlyFans models or watching cat videos. Snap could comply with HB3 by ceasing its use of an algorithm or addictive features, *see id.*, but changing the message of any post on the platform would make no difference, *see Turner*, 512 U.S. at 655. Nor, as the district court explained when it held that HB3 is content neutral, could Snap avoid HB3 "by changing [its] content moderation policies to include more or less of a certain subject matter or viewpoint." *CCIA*, 2025 WL 1570007, at *13.

That HB3 applies without regard to the subject matter of the speech they host is a critical distinction between HB3 and statutes enacted in other states that a handful of federal district courts have held are content based. *See, e.g., NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923, 951 (S.D. Ohio 2025) (applying strict scrutiny to Ohio law that included exemptions for websites that host product reviews and certain websites with information about news and current events); *NetChoice, LLC v. Griffin*, No. 23-5105, 2025 WL 978607, at *9 (W.D. Ark. Mar. 31, 2025) (applying strict scrutiny to Arkansas law that exempted social media platforms that predominantly feature "news, sports, entertainment," "academic or scholarly research," and "educational" programming); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1032 (W.D. Tex. 2024)

(applying strict scrutiny to Texas law that exempted social media platforms that "function[] to provide a user with access to news, sports [or] commerce"). HB3 contains no exceptions for websites that host news or sports stories, product reviews, academic or scholarly pieces, or any other subset of content. *See* FLA. STAT. § 501.1736(1)(e).

That HB3 applies to Snap because Snapchat allows users to upload content and view others' content—what Snap might refer to as "social speech"—does not render HB3 content based either. Any attempt by Snap at a linguistic sleight of hand that repackages this content-neutral requirement as one that targets a particular subject matter fails because HB3 applies to Snap whether users post about politics, sex, news, drugs, sports, or violence. *See Bonta*, 2025 WL 2600007, at *9 ("California's use of 'social media' platform as statutory shorthand does not render the Act content based, since it applies to websites whether they facilitate social interaction or other forms of content."). In this sense, HB3 differs from the robocall regulation, for example, which was content based, not because it applied to robocalls, but because it turned on the topic of a call. *See Otto*, 981 F.3d at 862. HB3 is more akin to the requirement that bands use a city's sound system, which was not content based because its application did not turn the message of any band. *See id.* at 863.

## C. HB3 Easily Satisfies Intermediate Scrutiny.

A regulation satisfies intermediate scrutiny if it "further[s] an important Government interest unrelated to the suppression of free expression and do[es] not burden substantially more speech than necessary to further that interest." *TikTok*, 604

U.S. at 73–74. To satisfy this standard, a "regulation need not be the least speech-restrictive means of advancing the Government's interest." *Id.* at 76 (quoting *Turner*, 512 U.S. at 662). The regulation need only "'promote[] a substantial government interest that would be achieved less effectively absent the regulation'" and "not 'burden substantially more speech than is necessary' to further that interest." *Id.* (quoting *Ward*, 491 U.S. at 799). And courts "must accord substantial deference to the predictive judgments of [the Legislature]" because "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Id.* at 75 (quoting *Turner*, 512 U.S. at 665). HB3 satisfies this standard with ease.

To start, HB3 furthers a "compelling" government interest that is unrelated to the suppression of free expression: "protecting the physical and psychological well-being of minors." *Sable Commc'ns*, 492 U.S. at 126. Adolescent use of social media is pervasive, and adolescents are especially susceptible to compulsive use that resembles addiction to drugs and gambling. DE24-5:57, 60–63, 80–81. This widespread behavioral addiction in turn has disastrous consequences for adolescents' sleep, mental health, and overall wellbeing. DE24-5:97, 102, 105, 115, 125–28, 131–34. This evidence informed the Florida Legislature's decision to enact HB3. *See, e.g.*, FLA. H.R., STAFF FINAL BILL ANALYSIS, H.B. 3 at 2–7 (Mar. 28, 2024). By reducing adolescent exposure to features of Snapchat that are addictive such as infinite scrolling, DE24-5:70–80, HB3 as applied

to Snap furthers an interest that the Supreme Court has held is "compelling," *Sable Commc'ns*, 492 U.S. at 126.

Florida could not achieve its interest in protecting the physical and psychological wellbeing of minors as effectively without HB3. "[R]esearch literature on social media use and mental health supports the prohibition of anyone under the age of 14 from having an account and requiring 14- and 15-year-olds to obtain parental consent to become an account holder, as required by FLA. STAT. 501.1736 (HB 3)." DE24-5:115. HB3 targets the addictive features of Snapchat that exploit behavioral psychology and requires Snap to cease contracting with its users who are the most vulnerable to manipulation by those features. *See* FLA. STAT. § 501.1736(1)(e), (2)(a), (3)(a); DE24-5:31, 70–80. HB3 is a precise weapon that aims at the heart of what causes adolescents to become so addicted to Snapchat that at least 10 percent of them spend more than two hours a day on it. *See* FLA. STAT. § 501.1736(1)(e); DE24-5:70–80.

And although parental controls are irrelevant under intermediate scrutiny "even assuming [they] are equally or more effective" than HB3, *Free Speech Coal. v. Paxton*, 145 S. Ct. 2291, 2318 (2025), parental controls are, in any event, "insufficient to prevent behavioral addiction to Snapchat, and in many cases do not actually address the core design features that drive compulsive engagement." DE24-5:82. Indeed, Snap already operates a "Family Center" that gives parents access to limited controls—if their child provides the "mutual consent" necessary to activate the Family Center. DE24-5:82–83. Unsurprisingly, only 0.3 percent of teen Snapchat users have opted into the Family

Center, i.e., 200,000 parents for 60 million users under age 18. DE24-5:83. And, in any event, the Family Center does nothing to address Snap's addictive features. Nor do Snapchat's settings, which capitalize on the fact that "users rarely modify default settings" and by default allow push notifications and autoplay. DE24-5:84. Presented with evidence that parental controls are inadequate—and in some cases counterproductive, the Legislature opted for a more effective approach and enacted HB3. *See* FLA. H.R., STAFF FINAL BILL ANALYSIS, H.B. 3, at 6–7 (Mar. 28, 2024).

To the extent that HB3 burdens speech, it certainly does not burden *substantially* more speech than necessary to protect the physical and psychological wellbeing of minors. *See TikTok*, 604 U.S. at 76. First, HB3 applies only to Snapchat users under 16. *See* FLA. STAT. § 501.1736(2)(a), (3)(a). "Social media is more strongly linked to negative outcomes among children and younger teens compared to older teens," and the evidence of harm is "more pronounced . . . on the mental health of those under 15 compares to those 16 and older." DE24-5:112–13; *accord* DE24-5:80–81, 112–15; *see also* DE24-5:33 ("If such sizable effects occurred in college-aged youth, these findings raise serious concerns about the risk of harm from social media exposure for children and adolescents who are at a more vulnerable stage of brain development."). So HB3's application to Snapchat users under 16 is narrowly tailored to focus on the minors who face the greatest risk from exposure to Snapchat's addictive features and that application is well-supported by "research literature on social media use and mental health." DE24-5:115.

Second, even with this category of minors who are most at risk, HB3 allows 14- and 15-year-olds to hold Snapchat accounts with parental consent. *See* FLA. STAT. § 501.1737(3)(a). HB3 thus further tailors its application to account for the fact that as adolescents age the effect of Snapchat's addictive features on them becomes less profound. *See* DE24-5:113–15. And HB3 reserves its most stringent application for younger Snapchat users.

Third, HB3 applies to Snap because at least 10 percent of daily active users who are under 16 spend an average of two hours a day or longer on the platform. *See* FLA. STAT. § 501.1736(1)(e)(2); DE24-5:183. That is, HB3 applies to Snap because many children are exposed to Snapchat's addictive features for multiple hours a day. And the use of social media for more than two hours a day is associated with substantially worse mental-health outcomes for minors. DE24-5:108–09. "[C]orrelational evidence consistently demonstrates that the more time a child or teen spends on social media, the more likely it is that they will be depressed, have low well-being, or be unhappy." DE24-5:109. Not only is social media use related to poor mental-health outcomes, research indicates a causal connection between "social media use" and "depression and low psychological well-being rather than depression causing social media use or the link being caused by other factors." DE24-5:111. So HB3 is a tailored approach that applies to Snap because minors' excessive use of Snapchat is likely to cause a decline in their mental health.

Fourth, HB3 applies to Snap because it uses addictive features that promote the compulsive use of social media. *See* FLA. STAT. § 501.1736(1)(e)(4); DE24-5:35, 57. HB3 does not apply to Snap simply because Snapchat is a popular social media platform. HB3 instead applies to Snap because it uses features that are connected to excessive social media use and the negative mental-health outcomes that follow. Because HB3 is narrowly tailored in these four significant ways, it does not burden more speech than necessary to achieve Florida's interest, let alone burden *substantially* more than necessary.

Although the district court purported to apply intermediate scrutiny to reach the opposite conclusion, its analysis more closely resembled strict scrutiny and flouted Supreme Court precedent. The Supreme Court reiterated this past term that a "regulation 'need not be the least restrictive . . . means of' serving the State's interest" to survive intermediate scrutiny. *Paxton*, 145 S. Ct. at 2317 (quoting *Ward*, 491 U.S. at 798); *see Bonta*, 2025 WL 2600007, at *10. Yet the district court faulted HB3 for not being as narrow as possible. *See CCIA*, 2025 WL 1570007, at *17 ("[E]ven if a social media platform created youth accounts for which none of the purportedly 'addictive' features are available, it would still be barred from allowing youth to hold those accounts if the features were available to adult account holders.").

The Supreme Court also reiterated this past term that courts "must accord substantial deference to the predictive judgments of [the Legislature]" and that "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete

44

empirical support may be unavailable." *TikTok*, 604 U.S. at 75 (quoting *Turner*, 512 U.S. at 665). Yet the district court faulted HB3 for applying only to platforms for which more than 10 percent of daily active users under 16 spend at least two hours a day because the Florida Legislature could not be certain that those users are addicted. *See CCIA*, 2025 WL 1570007, at *17 ("[T]he ability of youth under 16 to access a given social media platform will turn on how long other youth have used the platform in the last year, whether they have used it for that long because they are 'addicted' or because they simply wished to engage with speech for more than two hours per day.").

The Supreme Court also reiterated this past term that a "regulation's validity does not turn on [courts'] agreement with the [legislature] concerning the most appropriate method for promoting significant government interests or the degree to which those interested should be promoted." *Paxton*, 145 S. Ct. at 2317 (citation and internal quotation marks omitted). So when the Supreme Court evaluated an internet age-verification law under intermediate scrutiny, it determined that parental controls were irrelevant "even assuming [they] are equally or more effective" than the age-verification law. *Id.* at 2318. Yet the district court faulted the Florida Legislature for not enacting a measure directed at parental education—despite the evidence discussed above that parental control tools do not work. *See CCIA*, 2025 WL 1570007, at *18 ("[I]f parents do find the available tools confusing or difficult to use, the appropriate role for the state is to provide educational tools and resources for parents to learn how to do so.").

Finally, the district court's reliance on *Packingham v. North Carolina*, 582 U.S. 98 (2017), is misplaced. *CCIA*, 2025 WL 1570007, at *16. *Packingham* held that a state law that prohibited sex offenders from accessing social media sites where minors are active failed intermediate scrutiny. 582 U.S. at 101, 105–08. That law differs from HB3 in several important respects. HB3 does not prohibit minors between the ages of 13 and 15 from accessing Snapchat; it prohibits the creation of Snapchat accounts by 13-year-olds and 14- and 15-year-olds without parental consent as long as Snap continues to use addictive features. *See* FLA. STAT. § 501.1736(1)(e), (2)(a), (3)(a). The Supreme Court explained in *Packingham* that its opinion did not mean that states could not enact "narrowly tailored laws that prohibit a sex offender from engaging in conduct that often presages a sexual crime, like contacting a minor or using a website to gather information about a minor." 582 U.S. at 107. HB3 is akin to these kinds of narrowly tailored laws because of its focus on addictive features and the most vulnerable Snapchat users; it is not the blunt instrument that was at issue in *Packingham*.

\*      \*      \*

HB3 does not implicate the First Amendment because it regulates nonexpressive conduct for reasons unrelated to any message conveyed on Snapchat or by Snap. Nor does it impose a disproportionate burden on those engaged in expression because it limits its reach to those most vulnerable to Snapchat's addictive features. But even if HB3 did implicate the First Amendment, as a content-neutral law that uses precision to

protect minors between the ages of 13 and 15 from Snapchat exploitative design, it easily satisfies intermediate scrutiny.

### D. The Other Preliminary Injunction Factors Favor the Department.

The remaining preliminary-injunction factors also favor the Department. *See Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205, 1219 (11th Cir. 2023). The Florida Legislature has determined that injunctive relief is warranted to prevent further violations of HB3. FLA. STAT. §§ 501.207(1)(b); 501.1736(5). Accordingly, the Department would suffer irreparable harm without a preliminary injunction because it could not otherwise prevent Snap from violating HB3 during this litigation and exposing additional minors to addictive features on Snapchat. *See Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see also United States ex rel. Mitchell v. Hayes Int'l Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969) (explaining that the "agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction" where "injunction is authorized by statute"); *Storer Commc'ns, Inc. v. Fla. Dep't of Legal Affs.*, 591 So. 2d 238, 240 (Fla. Dist. Ct. App. 1991) (explaining that the Department "did not have to establish irreparable harm, lack of an adequate remedy at law or public interest" because it was statutorily authorized to "seek injunctive relief"). Because the enforcement of state law is at issue, the balance of the equities and public interest factors merge. *See Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020). Those factors also favor the Department because the "balancing of the public interest has already been performed by the [Florida Legislature] when it

presumed that injunctive relief is the appropriate remedy for a violation" of HB3. *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). Snap also failed to contest in the district court the substantial evidence that the Department submitted in support of its preliminary-injunction motion. DE32:35–37 (arguing the other factors solely on the basis of HB3's purported unconstitutionality). The Department has presented strong, unrebutted evidence of the harms visited on Florida teens by Snap's addictive design. *See generally* DE24-5. That evidence satisfies the remaining factors. The Department is entitled to a preliminary injunction.

## CONCLUSION

The Court should vacate and remand with instructions to grant the Department's motion to remand or, alternatively, reverse the denial of the Department's motion for a preliminary injunction.

Dated: September 24, 2025                Respectfully submitted,

/s/David H. Thompson
David H. Thompson
Brian W. Barnes
Jack Tucker
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, DC 20036
Telephone: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
bbarnes@cooperkirk.com
jtucker@cooperkirk.com

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because this brief contains 12,586 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 11th Circuit Rule 32-4.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in 14-point Garamond font, a proportionately spaced typeface, using Microsoft Word for Office 365.

Dated: September 24, 2025                    /s/ David H. Thompson
                                             David H. Thompson

                                             *Counsel for Plaintiff-Appellant*

49

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system on September 24, 2025. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: September 24, 2025

/s/ David H. Thompson
David H. Thompson

*Counsel for Plaintiff-Appellant*