No. 25-12814

In The

# United States Court of Appeals
# For the Eleventh Circuit

---

OFFICE OF THE ATTORNEY GENERAL, STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

*Plaintiff-Appellant*,

v.

SNAP INC.,

*Defendant-Appellee*.

---

On Appeal from the United States District Court
for the Northern District of Florida, Pensacola Division
No. 3:25-cv-676 (Walker, J.)

---

**RESPONSE BRIEF OF APPELLEE SNAP INC.**

---

Christopher M. Kise
Lazaro P. Fields
CONTINENTAL PLLC
101 N. Monroe Street, Suite 750
Tallahassee, FL 32301
Tel.: (850) 332-0702

Katherine B. Wellington
HOGAN LOVELLS US LLP
125 High Street, Suite 2010
Boston, MA 02110
Tel.: (617) 702-7745
katherine.wellington@hoganlovells.com

Reedy C. Swanson
HOGAN LOVELLS US LLP
555 13th St. NW
Washington, DC 20004
Tel.: (202) 637-5764

February 9, 2026          *Counsel for Appellee Snap Inc.*

Attorney General v. Snap Inc., No. 25-12814

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, Defendant-Appellee Snap Inc. (SNAP) ("Snap"), hereby discloses:

1.      Snap is a publicly traded corporation and has no parent corporation.

2.      In November 2017, Tencent Holdings Limited (TCEHY) informed Snap that it purchased 10% or more of Snap's capital stock.

3.      Snap lists the following persons and entities that have or may have an interest in the outcome of this case, including persons listed by Plaintiff-Appellant:

AnchorsGordon, P.A.

Barnes, Brian W.

Butler, Victoria Ann

Cannon, Hope T. (United States Magistrate Judge)

Chris Kise & Associates, P.A.

Continental PLLC

Cooper & Kirk PLLC

Fields, Lazaro P.

Florida Office of the Attorney General, Consumer Protection Division

Foley, Elizabeth Price

Gordon, Alfred Benjamin III

Hildabrand, Clark L.

Attorney General v. Snap Inc., No. 25-12814

Hogan Lovells US LLP

Izzo, Anne Nicole

Kise, Christopher M.

Oates, Diane Kondor

Snap Inc. (SNAP)

Swanson, Reedy C.

Tencent Holdings Limited (TCEHY)

Thompson, David Henry

Uthmeier, James (Florida Attorney General)

Walker, Mark E. (United States District Judge)

Weilhammer, Nicholas J.

Wellington, Katherine B.

Wetherell, T. Kent. III (United States District Judge)

Valin, Donna Cecilia

/s/ Katherine B. Wellington
Katherine B. Wellington

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled oral argument on March 10, 2026.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ....................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ..............................................i

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION ...................................................................................................1

JURISDICTION......................................................................................................5

STATEMENT OF THE ISSUES............................................................................5

STATEMENT OF THE CASE...............................................................................6

    A.    Florida Adopts HB3, Severely Burdening Access To
             Speech Online............................................................................6

    B.    Florida Sues Snap .....................................................................7

    C.    Snap Removes This Lawsuit Based On Work For DHS And FDA...........8

    D.    The District Court Denies A Preliminary Injunction And Rejects
             Florida's Effort To Remand ....................................................11

    E.    This Court Questions The Scope Of Its Interlocutory Jurisdiction And
             Grants A Stay Pending The *CCIA* Appeal ...............................13

SUMMARY OF ARGUMENT ..............................................................................14

STANDARD OF REVIEW ...................................................................................17

ARGUMENT .........................................................................................................17

I.    THE DISTRICT COURT PROPERLY EXERCISED
      JURISDICTION UNDER THE FEDERAL-OFFICER
      REMOVAL STATUTE...............................................................18

    A.    Snap Acts Under DHS And FDA ...............................19

## TABLE OF CONTENTS–CONTINUED

Page

    1.   *Snap receives guidance and direction from federal officials in designing and implementing federal public-information campaigns* ..............................................19

    2.   *Florida misunderstands the legal standard and Snap's relationships with DHS and FDA* .............................24

  B.   This Lawsuit Relates To Snap's Work Under DHS And FDA .....28

II.  THE DISTRICT COURT CORRECTLY HELD THAT HB3 LIKELY VIOLATES THE FIRST AMENDMENT AS APPLIED TO SNAP ................................................................................33

  A.   HB3 Triggers First Amendment Scrutiny ......................................33

    1.   *HB3 directly regulates protected speech and expression of Snap and its users* ..................................................................33

    2.   *HB3 disproportionately burdens protected speech and expression* ........................................................................38

    3.   *Florida cannot recast HB3 as a regulation of nonexpressive activity* ...........................................................40

  B.   HB3 Is Subject To, And Cannot Withstand, Strict Scrutiny .........42

  C.   HB3 Cannot Survive Even Intermediate Scrutiny .........................47

    1.   *HB3 entirely forecloses an important medium of expression* ........................................................................47

    2.   *HB3 does not leave open adequate alternative channels* .......50

    3.   *HB3 burdens substantially more speech than necessary* .......52

    4.   *HB3 does not further Florida's asserted interests* .................55

III.  THIS COURT SHOULD NOT DIRECT THE DISTRICT COURT TO REMAND OR ENTER A PRELIMINARY INJUNCTION.............57

**TABLE OF CONTENTS–Continued**

Page

CONCLUSION ..................................................................................58

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

C<small>ASES</small>:

*Arkansas Educ. TV Comm'n v. Forbes*,
    523 U.S. 666 (1998)...............................................................................36

*Bailey v. Janssen Pharms., Inc.*,
    536 F.3d 1202 (11th Cir. 2008) ....................................................17

*Barrett v. Walker Cnty. Sch. Dist.*,
    872 F.3d 1209 (11th Cir. 2017) ....................................................44

*Board of Arlington Cnty. v. Express Scripts Pharm., Inc.*,
    996 F.3d 243 (4th Cir. 2021) ................................................. 24-26

*Brown v. Entertainment Merchants Ass'n*,
    564 U.S. 786 (2011)............................................... 4, 16, 48-50, 56

*Caver v. Central Ala. Elec. Coop.*,
    845 F.3d 1135 (11th Cir. 2017) ............................ 15, 18-20, 23,25, 27, 29, 31

*CCIA v. Uthmeier*,
    No. 25-11881, 2025 WL 3458571 (11th Cir. Nov. 25, 2025)..........13, 33, 40,
                                                   43, 44, 49, 55, 56

*CCIA v. Uthmeier*,
    __ F. Supp. 3d __, 2025 WL 1570007 (N.D. Fla. 2025)...............7, 8, 11, 33,
                                                   36, 37, 41, 47, 52

*City of Austin v. Reagan Nat'l Ad. of Austin, LLC*,
    596 U.S. 61 (2022)...............................................................................43

*City of Ladue v. Galileo*,
    512 U.S. 43 (1994)...............................................................................56

*Club Madonna Inc. v. City of Miami Beach*,
    42 F.4th 1231 (11th Cir. 2022) ....................................................38

*Colorado v. Symes*,
    286 U.S. 510 (1932)...........................................................................27

v

# TABLE OF AUTHORITIES–Continued

Page(s)

*DeFiore v. SOC LLC*,
　　85 F.4th 546 (9th Cir. 2023) ...................................................................24, 27

*Erznoznik v. City of Jacksonville*,
　　422 U.S. 205 (1975).....................................................................................47

*First Nat'l Bank of Boston v. Bellotti*,
　　435 U.S. 765 (1978).....................................................................................44

*Florida Preborn Rescue, Inc. v. City of Clearwater*,
　　161 F.4th 732 (11th Cir. 2025) ...............................................17, 52, 53, 56

*Forsyth Cnty. v. Nationalist Movement*,
　　505 U.S. 123 (1992).....................................................................................47

*Free Speech Coal. v. Paxton*,
　　606 U.S. 461 (2025)...............................................................................40, 55

*Frisby v. Schultz*,
　　487 U.S. 474 (1988).....................................................................................38

*Gary v. City of Warner Robins*,
　　311 F.3d 1334 (11th Cir. 2002) ..................................................................41

*Honeyfund.com, Inc. v. Governor of Fla.*,
　　94 F.4th 1272 (11th Cir. 2024) ...................................................................41

*Indigo Room, Inc. v. City of Ft. Myers*,
　　710 F.3d 1294 (11th Cir. 2013) ..................................................................41

*In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
　　702 F. Supp. 3d 809 (N.D. Cal. 2023)........................................................37

*Joseph Burstyn, Inc. v. Wilson*,
　　343 U.S. 495 (1952).....................................................................................50

*Katzev v. County of Los Angeles*,
　　341 P.2d 310 (Cal. 1959).............................................................................50

*LaCroix v. Town of Ft. Myers Beach*,
　　38 F.4th 941 (11th Cir. 2022) ................................ 3, 4, 16, 17, 37, 47, 50-52

vi

**TABLE OF AUTHORITIES–Continued**

Page(s)

*Mangin v. Teledyne Continental Motors*,
91 F.3d 1424 (11th Cir. 1996) ........................................................................28

*Mayor & City Council of Baltimore v. BP P.L.C.*,
31 F.4th 178 (4th Cir. 2022) .........................................................................26

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995)........................................................................................54

*McMahon v. Presidential Airways, Inc.*,
502 F.3d 1331 (11th Cir. 2007) ....................................................................25

*Mesa v. California*,
489 U.S. 121 (1989)........................................................................................18

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974)........................................................................................35

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
460 U.S. 575 (1983)........................................................................................41

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024)........................................................ 16, 33-36, 28, 43, 46

*NetChoice v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ................................................................37, 47

*NetChoice v. Reyes*,
748 F. Supp. 3d 1105 (D. Utah 2024) ...........................................................43

*NetChoice v. Yost*,
778 F. Supp. 3d 923 (S.D. Ohio 2025) ..........................................................43

*Packingham v. North Carolina*,
582 U.S. 98 (2017)............................................................ 1, 16, 38, 39, 47-49

*Palmer v. Braun*,
287 F.3d 1325 (11th Cir. 2002) ....................................................................17

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015)...........................................................................16, 42, 44, 45

## TABLE OF AUTHORITIES–Continued

Page(s)

*Reno v. ACLU*,
    521 U.S. 844 (1997).................................................................. 38-40, 54, 55

*Sapuppo v. Allstate Floridian Ins. Co.*,
    739 F.3d 678 (11th Cir. 2014) .......................................................57

*Schleider v. GVDB Operations, LLC*,
    121 F.4th 149 (11th Cir. 2024) .....................................................19

*Sorrell v. IMS Health*,
    564 U.S. 552 (2011)......................................................................48

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) .....................................................57

*State v. Meadows*,
    88 F.4th 1331 (11th Cir. 2023) .....................................................32

*Students Engaged in Advancing Tex. v. Paxton*,
    765 F. Supp. 3d 575 (W.D. Tex. 2025) ........................................43

*Swain v. Junior*,
    961 F.3d 1276 (11th Cir. 2020) ....................................................45

*TikTok, Inc. v. Garland*,
    604 U.S. 56 (2025)..................................................................16, 33

*United States v. Grace*,
    461 U.S. 171 (1983)......................................................................38

*Virginia v. American Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988)......................................................................33

*Wacko's Too, Inc. v. City of Jacksonville*,
    134 F.4th 1178 (11th Cir. 2025) ...................................................56

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989)......................................................................38

*Watson v. Philip Morris Cos., Inc.*,
    551 U.S. 142 (2007)........................................ 14, 15, 18, 19, 25, 27, 30, 32

# TABLE OF AUTHORITIES–CONTINUED

Page(s)

*Wollschlaeger v. Governor of Fla.*,
848 F.3d 1293 (11th Cir. 2017) ...................................................44

**STATUTES:**

6 U.S.C. § 473(b)(2)(B)(i) ...........................................................19

6 U.S.C. § 473(b)(2)(F)..............................................................19

6 U.S.C. § 473(b)(5)..............................................................20, 26

21 U.S.C. § 387a(e)..................................................................20

21 U.S.C. § 393(d)(2)(D)............................................................20

28 U.S.C. § 1292(a)(1)................................................................5

28 U.S.C. § 1332......................................................................5

28 U.S.C. § 1442(a)(1)............................ 5, 11, 14, 15, 19, 25, 28

28 U.S.C. § 1447(d)...................................................................5

Fla. Stat. § 501.1736(1)(b).................................................4, 50, 51

Fla. Stat. § 501.1736(1)(e)(2) ............................................4, 50, 51

Fla. Stat. § 501.1736(1)(e) ..........................................................6

Fla. Stat. § 501.1736(1)(e)(1) ...............................................34, 42

Fla. Stat. § 501.1736(1)(e)(3) ...........................................35, 36, 46

Fla. Stat. § 501.1736(1)(e)(4)(a) ................................................37

Fla. Stat. § 501.1736(1)(e)(4)(b).................................................46

Fla. Stat. § 501.1736(1)(e)(4)(b)-(c) ...........................................36

Fla. Stat. § 501.1736(1)(e)(4)(c).................................................46

Fla. Stat. § 501.1736(1)(e)(4)(d).................................................37

Fla. Stat. § 501.1736(2)..............................................................6

## TABLE OF AUTHORITIES–CONTINUED

Page(s)

Fla. Stat. § 501.1736(2)(b) ...................................................................6

Fla. Stat. § 501.1736(3) .......................................................................6

Fla. Stat. § 501.1736(3)(b) ...................................................................6

Fla. Stat. § 501.1736(5) .......................................................................6

Fla. Stat. § 501.1736(11)(b) .................................................................54

Fla. Stat. § 501.1738 ...........................................................................54

Fla. Stat. § 1006.07(2)(f) .....................................................................53

Pub. L. No. 111-31, § 2, 123 Stat. 1776 (2009) ..................................20

### REGULATIONS:

Fla. Admin. Code R. 2-43.002 .............................................................54

Fla. Admin. Code R. 2-43.002(3)(b) ......................................................7

### OTHER AUTHORITIES:

Margaret A. Blanchard, *The American Urge to Censor*,
33 Wm. & Mary L. Rev. 741 (1992) ............................................49

DHS, *DHS Know2Protect and Snap Inc. Launch Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024),
https://perma.cc/6LEW-277X....................................................8, 9

Parents – Family Center, Snapchat,
https://parents.snapchat.com/family-center ................................53

*Press Conference: Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024),
https://perma.cc/QKJ6-BPZ2 .....................................................45

Mary I. Preston, *Children's Reactions to Movie Horrors and Radio Crime*,
19 J. Pediatrics 145 (1941) .........................................................49

Restatement (Third) of Agency § 1.01 cmt. f(1) (A.L.I. 2006) .............24

**INTRODUCTION**

The internet is a "vast democratic forum[]" that represents one of "the most important places . . . for the exchange of views" in the modern world. *Packingham v. North Carolina*, 582 U.S. 98, 104, 108 (2017). Teens, just like adults, access that forum to speak with friends, comment on current events, and learn about issues that matter to them. That is precisely why the federal government has partnered with Snap to craft and convey important public messages—including around preventing human trafficking and nicotine addiction—to teens through Snapchat. Florida's HB3 cuts off 13-year-olds entirely from this important speech, while imposing significant restrictions on 14- and 15-year-olds. Florida claims that HB3 passes muster under the First Amendment, but under the State's logic it would take little more than creative drafting to ban teenagers from accessing books, television, movies, or video games that Florida deems unacceptable. The First Amendment protects against precisely this outcome.

This appeal asks the Court to decide two crucial questions: First, whether Florida's lawsuit against Snap—which seeks to impede Snap's ability to assist federal agencies working to reach teen audiences with important public service announcements—belongs in federal court, and second, whether the First Amendment protects the speech of teenagers (and adults) on Snapchat. The answer to both questions is yes.

1

The federal government has for years contracted with Snap to ensure that its messages reach teens, including by designing custom Snapchat "Lenses" that allow teenagers to learn and comment about important topics, such as avoiding nicotine products. HB3 requires Snap to immediately stop providing service to a significant portion of the federal government's target audience of teens, and permits only some of that audience to be reinstated with parental consent. Because HB3 prevents Snap from fulfilling the aims of federal agencies seeking to inform and protect teens, Snap properly removed this suit to federal court.

On the merits, the Court should hold that HB3 violates the First Amendment as applied to Snap. There can be no real dispute that First Amendment scrutiny applies. HB3 flatly prohibits certain teens from accessing fully protected speech and imposes severe burdens on other teens and adults. Florida's claim that the First Amendment is not implicated because HB3 merely "prohibit[s] minors from accessing businesses that host expressive activity because of a nonexpressive feature of the business" is wholly unconvincing. Opening Br. 29. Online platforms like Snapchat are not the equivalent of establishments that serve alcohol; they are democratic forums for speech. Under Florida's reasoning, it could ban teenagers from entering bookshops, movie theaters, or churches, without ever implicating the First Amendment.

Under the First Amendment, HB3 does not pass constitutional muster.  It is a content-based regulation on speech:  It restricts teenagers from accessing *social* speech—that is, the everyday banter of ordinary people.  Under HB3, teenagers can watch ESPN's analysis of Superbowl LX, but they can't view their friend's play-by-play commentary or their uncle's lament over miscalled penalties—or contribute their views on the best Superbowl commercial.  HB3 targets this entire swath of informal speech, while leaving unregulated speech by platforms that do not allow users to contribute to the conversation.

Because HB3 is a content-based regulation, it is subject to strict scrutiny—which Florida has never argued it can satisfy.  For good reason:  HB3 is vastly overinclusive; it restricts highly valuable speech, including the government's attempts to reach teens on important issues including tobacco use.  It is also vastly underinclusive, permitting teenagers to access many other forms of media, from television shows to video games, and to use less popular online platforms regardless of what features they offer.  Florida has many less restrictive alternatives, including educating and empowering parents to make individualized judgments about what's right for their teens.

Even if the Court concludes that intermediate scrutiny applies, HB3 does not survive as applied to Snap.  HB3 "entirely foreclose[s]" speech on Snapchat—a "means of communication that is both unique and important."  *LaCroix v. Town of*

3

*Ft. Myers Beach*, 38 F.4th 941, 950-951 (11th Cir. 2022).  It leaves open no adequate alternative channels; indeed, if teenagers were to shift to an alternative, as soon as that platform became sufficiently popular, it too would be restricted.  Fla. Stat. § 501.1736(1)(b), (e)(2).  And HB3 is not narrowly tailored because Florida has less restrictive tools to facilitate parents' ability to monitor their teens' screen time and media use.

Every generation has concerns about media consumption by young people.  As Justice Scalia wrote for the Supreme Court in *Brown*, "dime novels" were once "blamed in some quarters for juvenile delinquency."  *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 797 (2011).  "When motion pictures came along, they became the villains instead," followed by "[r]adio dramas," then "comic books," "television[,] and music lyrics."  *Id.*  Just as the First Amendment does not permit the State to restrict teenagers from reading books, watching movies, listening to music, or playing videogames, it does not permit the State to restrict teenagers from engaging in fully protected speech online.  This Court should reject this latest effort to undermine the First Amendment.

## JURISDICTION

The District Court properly exercised subject-matter jurisdiction under 28 U.S.C. § 1442(a)(1), because this case relates to actions that Snap took when acting under a federal officer. *Infra* pp. 18-32.[1]

The District Court denied Florida's request for a preliminary injunction on August 13, 2025. A581-A582. Florida timely appealed on August 15, 2025. A584-A585. This Court has jurisdiction over the order denying the preliminary injunction under 28 U.S.C. § 1292(a)(1). As explained in Snap's response to the Court's jurisdictional question, Dkt. 20 at 13-16, the Court lacks jurisdiction over the District Court's order denying remand under 28 U.S.C. § 1447(d). That statute authorizes interlocutory appellate jurisdiction only for orders *granting* a remand, not denying remand. *See id.*

## STATEMENT OF THE ISSUES

1. Whether the District Court properly exercised subject-matter jurisdiction under the federal-officer removal statute where Florida seeks to hold Snap liable in part for actions it took to assist federal agencies with their statutory responsibilities to conduct important public awareness campaigns.

---

[1] Snap also invoked diversity jurisdiction under 28 U.S.C. § 1332. The District Court did not address that issue, and Florida has not raised it on appeal. Snap preserves that issue for remand if necessary.

5

2.   Whether Florida's HB3 likely violates the First Amendment as applied to Snap because it purports to ban certain teenage users from accessing fully protected speech; requires other teenage users to obtain parental consent to access protected speech; and imposes substantial burdens on adult users' ability to access protected speech.

## STATEMENT OF THE CASE

### A.    Florida Adopts HB3, Severely Burdening Access To Speech Online.

In 2024, Florida adopted HB3.  The statute identifies covered "social media platforms" by reference to the content available on a platform and how that content is curated.  A platform falls within the statute's scope if it: (1) "allows users to upload content or view the content or activity of other users"; (2) meets a threshold daily-use requirement; (3) "[e]mploys algorithms"; and (4) employs any of five features the Act deems "addictive" (infinite scrolling, auto play video, push notifications, interactive metrics, and live streaming).  Fla. Stat. § 501.1736(1)(e).  HB3 makes it illegal for covered platforms to allow users under 14 to create an account.  *Id.* § 501.1736(2).  Users aged 14 and 15 may create accounts only with express parental consent.  *Id.* § 501.1736(3).  Covered platforms must terminate all existing accounts for users who are prohibited from creating accounts.  *Id.* § 501.1736(2)(b), (3)(b).

The statute imposes substantial monetary sanctions "of up to $50,000 *per violation*."  *Id.* § 501.1736(5) (emphasis added).  Punitive damages are available

where Florida shows a "consistent pattern of knowing or reckless conduct." *Id.* The regulations create a safe harbor where Florida "will not find willful disregard of a person's age" if a company establishes "it has utilized a reasonable age verification method with respect to all who access the social media platform." Fla. Admin. Code R. 2-43.002(3)(b).

### B.    Florida Sues Snap.

Months before HB3 was set to take effect, two trade associations representing internet companies—the Computer & Communications Industry Association ("CCIA") and NetChoice—brought a pre-enforcement suit on behalf of their members arguing that HB3 violated the First Amendment. *CCIA v. Uthmeier*, No. 4:24-cv-00438 (N.D. Fla.). Snap is a NetChoice member. *CCIA v. Uthmeier*, __ F. Supp. 3d __, 2025 WL 1570007, at *2 (N.D. Fla. 2025) ("*CCIA II*"). Florida agreed not to enforce HB3 while the request for a preliminary injunction was pending. *See CCIA v. Uthmeier*, No. 4:24-cv-00438 (N.D. Fla. Mar. 13, 2025) ("*CCIA I*").

The District Court initially accepted Florida's argument that it was unclear whether any association members were subject to HB3. *Id.* at *1. It therefore denied a preliminary injunction without prejudice because the trade associations had not established Article III standing. *Id.*

While the *CCIA* parties were re-briefing the preliminary-injunction motion with additional evidence related to standing, Florida sued Snap in Florida state court,

alleging that Snap violates HB3.  *See* A10; *CCIA II*, 2025 WL 1570007, at *2. Alongside its complaint, Florida filed a request for a preliminary injunction "enjoining Snap from entering into or continuing any contractual relationship with a child who it knows is 13 or younger, or with a child who it knows is 14 or 15 without parental consent."  A186.  The complaint also alleges that Snap violates the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), claiming that certain Snap features are "unfair" or "deceptive" and that Florida believes they will "promote compulsive, prolonged, and unhealthy use by children."  A161-A162.

### C.    Snap Removes This Lawsuit Based On Work For DHS And FDA.

Snap has multi-year, collaborative relationships with DHS and FDA, and its work on behalf of those agencies involves aspects of Snapchat specifically targeted by Florida's lawsuit.

Snap partners with DHS as a foundational collaborator on Know2Protect, a first-of-its-kind federal campaign to educate users about online child sexual exploitation.  A568-569; SA3.  DHS relies on Snap to help reach its "key audience[]: teens."  DHS, *DHS Know2Protect and Snap Inc. Launch Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024) ("DHS Press Release").[2]  This program has been governed by Memorandums of Understanding ("MOUs"), which

---

[2] *Available at* https://perma.cc/6LEW-277X.

establish the framework by which DHS will direct and guide Snap's work.  A114-
126.

The MOUs provide that Snap assists DHS in multiple ways.  First, Snap
conducts custom research assessing teen awareness of risks relating to online child
sexual exploitation and abuse, which helps DHS design a more effective campaign.
SA3-SA4.  Second, Snap collaborates with DHS to build custom Know2Protect
content, including a custom Lens—an augmented-reality filter that can change the
way users or their backgrounds appear on screen.  A142.  This Lens is "a fun and
interactive quiz" designed to engage teenagers by making learning about online risks
into "an entertaining adventure"—as the sample view below illustrates.  DHS Press
Release.



**Murray Declaration, Exhibit C**

9

Third, Snap gives DHS advertising credits that DHS uses to promote the Know2Protect campaign on Snapchat. SA5. DHS has used the majority of those credits to reach teenagers aged 13-to-18. *Id.*

Snap also assists FDA's Center for Tobacco Products with public outreach campaigns to deter tobacco and nicotine use by young people—as demonstrated in the sample below.



**Howells Declaration, Exhibit B**

The relationship between Snap and FDA dates to 2019, A93, and is governed by Snap's Business Services Terms, which are a "legally binding contract" between Snap and FDA. A100. At the beginning of each annual cycle, FDA sends campaign briefs to Snap outlining the agency's objectives. *Id.* Based on those briefs, Snap

10

creates custom media plans, which include recommendations on leveraging Snap's tools and advertising options, including video advertisements and Lenses. *Id.* After the FDA approves campaign content, FDA purchases advertising on Snap's platform and directs Snap to target users aged 13-to-17. A95. All three campaigns the FDA approved for 2025 exclusively targeted teenagers aged 13-to-17. A93.

Based on these federal activities, Snap filed a timely notice of removal. A9; 28 U.S.C. § 1442(a)(1).

### D.  The District Court Denies A Preliminary Injunction And Rejects Florida's Effort To Remand.

About two weeks after Snap removed, the District Court entered a preliminary injunction in favor of CCIA and NetChoice in the separate pre-enforcement litigation. *CCIA II*, 2025 WL 1570007, at *1. The court found the associations had demonstrated that at least two members (including Snap) faced an imminent threat of enforcement. *Id.* at *7.

On the merits, the court concluded that HB3 likely violated the First Amendment. The court found that heightened scrutiny was appropriate because HB3 "directly regulate[s] speech" by burdening users' ability to "access[] a forum for speech." *Id.* at *12. The court applied intermediate scrutiny, "assume[d] without deciding" that the State had advanced a significant government interest in limiting "'compulsive use' of social media," and found that HB3 was not adequately tailored to that goal "either facially or as applied." *Id.* at *14-15. As the Court explained,

11

"the law's restrictions are an extraordinarily blunt instrument for" furthering that interest because HB3 burdens "forums for all manner of protected speech." *Id.* at *15. Young people, the court explained, "have their own interests, ideas, and minds" and are "citizens in training." *Id.* at *16. Ultimately, the court explained, the First Amendment leaves it to parents—not the State—"to make the appropriately individualized determinations about whether or when their children should use social media platforms." *Id.* at *18. Florida appealed.

In the meantime, Florida moved to remand this case, and the District Court denied that motion. The court held that Snap acts under both DHS and FDA for purposes of federal-officer removal because "Snap has contracted with these agencies to provide services that assist them in accomplishing their statutory responsibilities to conduct public information campaigns." A572. Snap therefore "performs work on behalf of the government" and does so "under the federal government's guidance or control." A574-A575.

The court recognized that Florida's claims were sufficiently related to Snap's responsibilities on behalf of the federal government because the HB3 "claim seeks to impose liability on Snap for doing just" what the federal government asked it to do. A577. And the court recognized that the federal-officer removal statute "permits removal of the entire action if even one of the claims satisfies its requirements," and

12

therefore concluded supplemental jurisdiction was proper over the FDUTPA claim. A576.[3]

The court denied Florida's request for a preliminary injunction, incorporating by reference its analysis in *CCIA II* that HB3 likely violated the First Amendment. A581. Two days later, the Department filed a notice purporting to appeal both the order denying a preliminary injunction and the order denying remand. A584.

### E.   This Court Questions The Scope Of Its Interlocutory Jurisdiction And Grants A Stay Pending The *CCIA* Appeal.

Shortly before Florida filed its opening brief, this Court directed the parties to address whether it has jurisdiction to review the order denying a remand. Dkt. 14-2. Snap's response explains that the Court lacks interlocutory appellate jurisdiction over the remand order. *See* Dkt. 20 at 13-16.

In late November, a sharply divided motions panel in the associations' case granted Florida a stay pending appeal. *See CCIA v. Uthmeier*, No. 25-11881, 2025 WL 3458571, at *4-9 (11th Cir. Nov. 25, 2025) ("*CCIA* Stay Order"). The majority held that Florida was likely to succeed in arguing that HB3 satisfies intermediate scrutiny. *Id.* at *4. Judge Rosenbaum dissented, explaining that HB3 is "plainly unconstitutional on its face" because it "chills countless users' speech on deeply

---

[3] The Court did not reach Snap's separate argument that the FDUTPA claim was also sufficiently related to Snap's federal responsibilities to remove. A576. The merits of the FDUTPA claim are not before the Court in this interlocutory appeal.

personal, political, religious, and familial matters." *Id.* at *14. Although Judge Rosenbaum would have applied strict scrutiny, she held that HB3 fails even intermediate scrutiny because it is "vastly overinclusive." *Id.* at *20.

Florida moved to align the argument in this case with the *CCIA* appeal, and this Court granted that motion. *See* Dkt. 25. The Court then ordered that the jurisdictional question be carried with the case. *See* Dkt. 34.

## SUMMARY OF ARGUMENT

**I.** The District Court properly exercised subject-matter jurisdiction under the federal-officer removal statute because this suit is "for or relating to" acts that Snap took while "acting under" DHS and FDA, and Snap has raised colorable federal defenses. 28 U.S.C. § 1442(a)(1).

Snap satisfies the "acting under" requirement because it has taken actions "to assist, or help carry out, the duties" of DHS and FDA in developing public-information campaigns on important issues for teenagers, including the risks of sexual abuse, nicotine, and vaping. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 152 (2007) (emphasis omitted). Snap receives significant direction and guidance from these agencies in fulfilling those responsibilities, including regarding the content that the agencies want to produce. *Id.* at 151-152. Snap then implements those agencies' instructions to target their campaigns to teenage Snapchat users,

including in Florida.  Florida's counterarguments rely on strained readings of out-of-circuit precedent.

Florida's lawsuit is also "for or relating to" Snap's actions on behalf of the federal government.  28 U.S.C. § 1442(a)(1).  This lawsuit seeks to hold Snap liable for providing service to teenagers aged 13-to-15 in Florida and for using certain design features, including Lenses and algorithmic content recommendations.  But in the course of its work for the federal government, Snap utilizes these disputed features and implements the government's directions to serve content to users aged 13-to-15 in Florida.  Florida's requested preliminary injunction would immediately interfere with Snap's ability to perform this work for the federal government.  *See Watson*, 551 U.S. at 150.  This is more than enough to clear the "quite low" bar "erected by this requirement."  *Caver v. Central Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017).

Florida also does not dispute that Snap has a colorable federal defense, or that the District Court properly exercised supplemental jurisdiction over the FDUTPA claim.  Accordingly, if this Court reaches the jurisdictional issue, it should affirm the order denying remand.

**II.**  The District Court did not abuse its discretion in denying a preliminary injunction because HB3 likely violates the First Amendment as applied to Snap.

First Amendment scrutiny applies because HB3 directly regulates protected expression and imposes a "disproportionate burden" on First Amendment activity. *TikTok, Inc. v. Garland*, 604 U.S. 56, 68 (2025) (quotation marks omitted). The law singles out platforms that carry protected speech for special burdens not applicable to other online platforms, and it targets platforms based on expressive features.

The Court should apply strict scrutiny because HB3 "target[s] speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quotation marks omitted). HB3 applies to *user-generated* speech. That distinction is content-based or, at the very least, reflects a suspect speaker-based distinction because it privileges institutional speakers (like news organizations) over users. HB3 also imposes regulatory burdens on Snap's proprietary content algorithm, which is protected expression under *Moody v. NetChoice, LLC*, 603 U.S. 707, 738 (2024), and it targets content-based communications like push notifications and interactive metrics. Strict scrutiny thus applies, and Florida has never argued that the law passes muster under that standard.

Even if intermediate scrutiny applies, however, HB3 cannot stand because it "entirely foreclose[s]" an important means of communication for 13-year-olds, while imposing a parental-consent requirement on 14- and 15-year-olds. *LaCroix*, 38 F.4th at 950 (quotation marks omitted); *see Packingham*, 582 U.S. at 104; *Brown*, 564 U.S. at 765 n.3. HB3, moreover, is designed to foreclose any effective

16

alternatives.  HB3's blunt-force approach also burdens substantially more speech than necessary to meet its goals and contains unexplained exemptions that call into serious doubt whether it meaningfully serves those goals at all.  *See Florida Preborn Rescue, Inc. v. City of Clearwater*, 161 F.4th 732, 744 (11th Cir. 2025); *LaCroix*, 38 F.4th at 945.  The District Court correctly concluded that HB3 likely fails intermediate scrutiny.

**III.**  If the Court disagrees with Snap, it should not enter directions to remand or grant a preliminary injunction.  Snap preserved additional arguments on both issues that have yet to be adjudicated and that Florida did not raise in its opening brief.  This Court should follow its ordinary course and leave those issues to be addressed in the first instance by the District Court if a remand is necessary.

## STANDARD OF REVIEW

"The grant or denial of a preliminary injunction is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  To the extent this Court reviews orders denying remand to state court, it does so de novo.  *Bailey v. Janssen Pharms., Inc.*, 536 F.3d 1202, 1204 (11th Cir. 2008).

## ARGUMENT

If the Court concludes it has interlocutory appellate jurisdiction over the issue, it should affirm the District Court's exercise of federal-officer jurisdiction.  Snap has

partnered for years with the federal government to produce and share important public safety and health messaging. HB3 would hold Snap liable for acts that it took as part of those federal activities. The State's contrary arguments rely on mistaken characterizations of the applicable legal tests and Snap's relationships with DHS and FDA.

The Court should likewise affirm the District Court's refusal to grant a preliminary injunction. HB3 imposes substantial burdens on the abilities of teens and adults to access fully protected speech online. Those burdens vastly exceed what is necessary to serve the State's asserted goals. Under any level of First Amendment scrutiny, HB3 cannot pass muster.

## I.    THE DISTRICT COURT PROPERLY EXERCISED JURISDICTION UNDER THE FEDERAL-OFFICER REMOVAL STATUTE.

The federal-officer removal statute "applies to private persons who lawfully assist the federal officer in the performance of his official duty." *Watson*, 551 U.S. at 151 (quotation marks omitted). Snap must meet three requirements to remove. First, Snap must have "acted under" a federal officer. *Caver*, 845 F.3d at 1142. Second, the removal must be of a suit "for or relating to any act under color of such office." *Id.* (quotation marks and emphasis omitted). And third, Snap must raise a colorable federal defense, which satisfies Article III's requirement that the case arise under federal law. *Mesa v. California*, 489 U.S. 121, 136 (1989).

18

Florida does not contest that Snap satisfies the colorable federal defense requirement. Thus, jurisdiction turns on whether Snap "acted under" federal officials and whether this lawsuit is "for or relates to" those acts. Snap's work for both DHS and FDA satisfies those requirements.

## A.    Snap Acts Under DHS And FDA.

### 1.    *Snap receives guidance and direction from federal officials in designing and implementing federal public-information campaigns.*

Snap is "acting under" DHS and FDA within the meaning of Section 1442(a)(1) when assisting with their respective public awareness campaigns. The "acting under" requirement is "broad" and is satisfied when a defendant is acting "to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 147, 152. This test is met when a defendant is "help[ing] the government to produce [something] that it needs," *Caver*, 845 F.3d at 1144, or "act[ing] under an agreement with a federal agency to provide a service that the federal agency would have otherwise provided," *Schleider v. GVDB Operations, LLC*, 121 F.4th 149, 158 (11th Cir. 2024). Here, Snap does both.

DHS and FDA's public awareness campaigns fall squarely within their statutory responsibilities. Congress has directed DHS to conduct "outreach and training activities" related to "child exploitation prevention." 6 U.S.C. § 473(b)(2)(F), (B)(i). And FDA is required to "conduct[] educational and public

19

information programs relating to [the agency's] responsibilities," 21 U.S.C. § 393(d)(2)(D), which include implementing the 2009 Tobacco Control Act. 21 U.S.C. § 387a(e). A key objective of that Act is to curb tobacco and nicotine use by young adults. Pub. L. No. 111-31, § 2, 123 Stat. 1776, 1776-81 (2009).

Snap has provided assistance to both campaigns with significant guidance and direction from DHS and FDA, helping those agencies "fulfill" these "congressional objective[s]." *Caver*, 845 F.3d at 1144. Snap has executed two MOUs with DHS that "establish a framework of cooperation between" the agency and Snap. A114; A121. These agreements are made pursuant to the authority of DHS's Cyber Crimes Center to "enter into cooperative agreements to accomplish" DHS's statutory "functions." 6 U.S.C. § 473(b)(5); *accord* A114, A121 (invoking this authority). The MOUs provide that Snap will serve "as a foundational collaborator" to conduct research on behalf of DHS, creating a "campaign-themed lens available only on Snapchat" and other "cobranded digital products" for DHS's public service ad campaign, Know2Protect, and then assisting with serving ads as directed by the federal government. A115; A122 (quotation marks omitted).

As the MOUs contemplate, Snap delivered to DHS multiple tranches of research, which DHS used "to help inform the development of the Know2Protect campaign." SA4. Snap then worked with DHS and its advertising contractor to produce the Know2Protect Lens, an interactive, true/false quiz that allows users to

20

select their answer with head movements. *Id.*; *supra* p. 9 (image of Lens). DHS "determined the questions and answers to be included in the true/false quiz and submitted those to Snap." SA4. Snap received a "creative brief" from DHS providing "goals and objectives, the messaging [the agency] wanted to highlight, and branding specifications," which guided Snap in developing the Lens. *Id.* Snap met with DHS on an as-needed basis, typically around once a month or every other month. *Id.* DHS approved the final content for the Lens. *Id.*

DHS then used its advertising credits on Snapchat to promote the Know2Protect lens and other campaign content, including video advertisements. *Id.* DHS directed Snap to target teenage users between 13 and 18 for the majority of the campaign's content, and Snap relied on its proprietary algorithms to fulfill this instruction. *Id.* Indeed, DHS's press release highlighted that it chose to partner with Snap precisely because Snapchat "resonates strongly with teens." *Id.* DHS's campaign manager explained that this collaboration has been "instrumental in helping [DHS] reach key demographics with critical awareness and prevention messaging," which is "making a real difference in saving lives." *Id.* (quotation marks omitted).

Snap fulfills a similar role in FDA's anti-tobacco and nicotine campaigns. Snap has had an assigned "client partner" for FDA who assists the agency to "design their advertising campaigns and optimize ongoing campaigns to most effectively

reach their desired audiences."  A92.  FDA has sent Snap highly detailed "'campaign briefs' that describe the focus of the" planned campaigns.  A95; SA10, SA19, SA27.[4] These briefs asked Snap to submit proposals regarding how Snap could "help each campaign's message reach its targeted teenage user audience."  A95.  Snap has recommended various distribution channels for FDA's materials across the kinds of content available on Snap, including commercials that cannot be skipped and Lenses.  A96.  In 2025, the FDA approved multiple campaigns for targeting users aged 13-to-17, including in Florida.  A95-A96.  Snap relied on its proprietary algorithms, among other tools, to implement FDA's instructions regarding whom to serve with content.  A95.

Snap's work on behalf of DHS and FDA more than satisfies the acting-under requirement.  For both agencies, Snap is engaged in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior" and does so "subject to the instruction, direction, [and] guidance of" the agencies.  *Watson*, 884 U.S. at 151-152 (quotation marks omitted).  Snap receives guidance about what kind of content the agencies seek to run; it assists the agencies in developing that content; and then it implements the agencies' instructions to deliver that content to teenage users, including in Florida.  *Supra* pp. 20-22.

---

[4] These documents were filed under seal because FDA directed Snap to treat them as "strictly confidential."  SA10, SA19, SA27.

This Court's decision in *Caver*—which Florida relies on (at 18-19)—confirms that Snap meets the "acting under" requirement. There, the defendant was a non-profit rural electric cooperative created by Alabama law, whose only modern relationship with the federal government was "substantial loans" from the Department of Agriculture. 845 F.3d at 1139. These loans came with extensive regulatory requirements, but following the Supreme Court's decision in *Watson*, those "federal regulations alone [were] not enough to satisfy the federal officer removal statute." *Id.* at 1143. This Court looked to the history of rural electric cooperatives and their integral role in advancing Congress's rural electrification scheme to conclude that this role *combined with* federal regulatory requirements attached to the loans "help[ed] assist or carry out the [electrification] duties of" the federal government. *Id.* The Court found this combination sufficiently similar to "a federal contractor performing work on behalf of the government." *Id.* at 1144.

Here, Snap *in fact* has active service agreements with both DHS and FDA "to provide a public function conceived of and directed by the federal government." *Id.* In other words, as the District Court put it, "Snap is assisting the federal government in carrying out its tasks and doing so under the federal government's guidance and control." A575. Under *Caver*, that means Snap was "acting under" those agencies.

The fact that Snap and the agencies work with media partners in the course of fulfilling the federal agencies' obligations does not make removal less appropriate.

Indeed, Florida has dropped on appeal its argument that removal is not appropriate merely because Snap worked with media agencies employed by FDA and DHS. As the District Court pointed out, the judicial consensus is that private parties are "acting under" the federal government even when they are subcontractors. A573 n.8; *see, e.g.*, *Board of Arlington Cnty. v. Express Scripts Pharm., Inc.*, 996 F.3d 243, 254 (4th Cir. 2021).

> 2.    *Florida misunderstands the legal standard and Snap's relationships with DHS and FDA.*

Florida's primary counterargument (at 19-21)—which appeared nowhere in its brief below and relies almost exclusively on an out-of-circuit case it did not cite below—is that removal is only permitted if the relationship between Snap and the federal agencies is tantamount to common-law agency. But Florida can cite no case from any court that has ever required a finding of common-law agency before removal was appropriate. Even *DeFiore v. SOC LLC*, the Ninth Circuit case Florida relies on so heavily, clarifies (in a passage Florida fails to mention) that it "do[es] not decide whether 'acting under' a federal officer is a status necessarily limited to the government's common-law agents." 85 F.4th 546, 556 (9th Cir. 2023).

And it is no wonder that courts have not required a finding of common-law agency. As Florida recognizes (at 19), an "essential element of agency is the principal's right to *control* the agent's actions." Restatement (Third) of Agency § 1.01 cmt. f(1) (A.L.I. 2006). Yet Congress chose a broader formulation than

"control" here, requiring only that the defendant be "acting under" a federal officer. 28 U.S.C. § 1442(a)(1). The Supreme Court and this Court have understood that Congress deliberately chose a "broad" formulation that "typically involves subjection, guidance, *or* control." *Watson*, 551 U.S. at 147, 151 (emphasis added); *accord Caver*, 845 F.3d at 1143. This disjunctive test makes clear that a court may find a defendant is "acting under" a federal officer even without the "essential element" of agency—namely, control.

For all these reasons, Florida's invocation (at 20-21) of the "no agency" clauses in the applicable contracts gets Florida nowhere. The fact that Snap does not act as an "agent" of DHS and FDA does not refute the evidence making clear that those agencies provided extensive guidance and direction to Snap with respect to their youth-outreach campaigns. Indeed, this Court has not questioned the District Court's exercise of federal officer jurisdiction even where the Court had "expressly … not determined" that the contractor had "establish[ed] agent status." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1337, 1343 n.14 (11th Cir. 2007).

Florida makes virtually no argument that Snap cannot meet the more relaxed test articulated in *Watson* and *Caver* that looks for either "guidance" or "control." Instead, it invokes more out-of-circuit authority for the proposition that "a mere contract for 'goods and services is insufficient.'" Opening Br. 20 (quoting *Express*

*Scripts*, 996 F.3d at 251).  But the authority Florida invokes draws a distinction between "the simple sale of contracted goods and services" and situations where a provider works to produce custom goods or services to the federal government's specifications.  *Express Scripts*, 996 F.3d at 251.  The federal agencies' arrangements with Snap do not involve "off-the-shelf products." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 230 n.20 (4th Cir. 2022).  Instead, Snap helps develop custom communication products in accordance with the agencies' instructions.

Florida's suggestion (at 21-22) that Snap did not "carry out the statutory duties of DHS or the FDA" is, frankly, difficult to understand.  In the same paragraph, Florida *concedes* that the agencies have statutory duties to produce the public awareness campaigns at issue here. *See supra* pp. 19-20.  The suggestion that Snap was merely a passive carrier of advertisements ignores Snap's role in conducting research to inform the DHS campaign, designing the advertisements and messaging for both agencies, and employing its proprietary algorithms to implement the federal government's directions with respect to the government's target audience.[5]

---

[5] Florida claims (at 22) there is no express statutory delegation of federal authority, but cites no precedent saying such a delegation is required.  In any event, the DHS MOUs recite the express grant of statutory authority to collaborate with non-governmental entities on the Know2Protect campaign. *Supra* p. 20 (citing 6 U.S.C. § 473(b)(5)).

Florida faults (at 22-23) the District Court for emphasizing that a liberal construction is warranted in federal-officer removal cases. But Florida does not deny this is black-letter law. *See, e.g.*, *Watson*, 551 U.S. at 147; *Colorado v. Symes*, 286 U.S. 510, 517 (1932); *Caver*, 845 F.3d at 1142-43. And it is no wonder the District Court felt the need to emphasize this point, after Florida repeatedly and erroneously asserted below that there was a presumption against removal in federal-officer cases. *See* A59; A65-A66. Florida's charge (at 23) that the District Court's interpretation of the statute is "limitless" once again attacks a straw man. The appropriateness of removal in this case is driven by the startling breadth of Florida's lawsuit, which attempts to regulate vast quantities of protected speech, including speech produced and distributed at the direction of the federal government on important safety and public health topics impacting teenagers.

Finally, Florida—again, for the first time on appeal—espouses a theory ventured by a single, dissenting Ninth Circuit judge that Snap must identify a specific federal officer that it is "acting under." *See DeFiore*, 85 F.4th at 562 (Collins, J., dissenting). Florida can cite no case anywhere adopting that requirement, nor can it point to any suggestion this Court requires it. Florida asserts that *Mangin v. Teledyne Continental Motors* applied this requirement, but *Mangin* merely noted that the defendant *had* named the head of the Federal Aviation

27

Administration, without addressing whether doing so was legally required.  91 F.3d 1424, 1429 n.1 (11th Cir. 1996).

In any event, Snap has named the particular officer in charge of its relationship with DHS for purposes of the Know2Protect campaign: Kate Kennedy, who has praised Snap's effectiveness in reaching "key demographics"—*i.e.*, teenagers.  SA6; *see* A126 (MOU naming Kate Kennedy as lead contact).  The campaign briefs for FDA likewise specify the team leaders for FDA's marketing agency by name.  *See* SA10, SA19, SA27; *supra* p. 24 (citing cases holding that a subcontracting relationship is sufficient).  Florida simply ignores these aspects of the record.[6]

## B.    This Lawsuit Relates To Snap's Work Under DHS And FDA.

The District Court correctly held that "at least one of the claims against [Snap] is 'for or relating to' an act performed under color of federal office."  A575 (quoting 28 U.S.C. § 1442(a)(1)).  Congress specifically amended the federal-officer removal statute in 2011 "to 'broaden the universe of acts' that provide a basis for federal officer jurisdiction."  *Id.* (quotation marks omitted).  Under the current formulation, Snap must show only a "connection or association between the act in question and the federal" activity.  *Id.* (quotation marks omitted).  The "hurdle erected by this

---

[6] If this Court adopts a named-individual requirement and concludes the existing showing is insufficient, Snap should be given an opportunity to supplement the record given that Florida did not raise this issue below.

requirement is quite low," and Snap easily clears it. *Caver*, 845 F.3d at 1144 (quotation marks omitted).

In the HB3 count, Florida seeks to hold Snap liable for providing service to any users under 13 and for providing service without parental consent for users between 14 and 15. A160. That claim is directly related to Snap's activities under both DHS and FDA because both agencies have specifically directed Snap to serve users between the age of 13 and 17. Those users are the primary intended audience of the federal government's campaigns. *Supra* pp. 21-22. Moreover, the Government has asked Snap to use some of the features that HB3 brands as "addictive" in the course of those campaigns, including auto-play advertisements and Snap's proprietary algorithms. A577; *supra* pp. 21-22. Thus, the "acts for which [Snap] is being sued … occurred" at least in part "because of [Snap's] performance of its duties" in implementing the federal agencies' directions. *Caver*, 845 F.3d at 1145. That is more than enough to show that there is a "connection or association" between Snap's work and the HB3 claim.

Although the District Court did not reach it, the FDUTPA claim likewise has a connection or association to Snap's activities. That claim seeks to impose liability for Snap's provision of certain "features" that Florida alleges "promote compulsive, prolonged, and unhealthy use by children." A161. Those features include Snapchat's content selection algorithm and its Spotlight and Discover features,

29

which have been employed in the DHS and FDA campaigns. A94-A95; SA4. The FDUTPA claim also seeks to hold Snap liable based in part on the incidence of supposed "sexualized, drug-related, and other mature content" occurring on the platform. A161-A162. These terms are used so broadly in Florida's complaint that they encompass both the content about child exploitation featured in the Know2Protect campaign and FDA's campaigns involving nicotine and tobacco use. Thus, Florida's FDUTPA claim likewise involves a clear "connection or association" with Snap's work for DHS and FDA.[7]

Removal here thus finds support in the "basic purpose" of the federal-officer removal statute: "to protect the Federal Government from … interference with its operations." *Watson*, 551 U.S. at 150 (quotation marks omitted). The preliminary injunction that Florida seeks would require Snap to immediately cease service to users aged 15 and under—permanently so for all 13-year-olds. It would also put significant pressure on Snap to cease offering the features that the federal government has employed. DHS and FDA would therefore be hindered in their ability to reach their target audience through Snapchat, which as DHS explained, has been a uniquely valuable partner in reaching teenagers. SA6-SA7

---

[7] Even if the Court finds that only one of the Department's claims satisfies the causal nexus requirement, the District Court determined that it would exercise supplemental jurisdiction, A576 & n.9, and Florida does not challenge that decision on appeal.

30

Florida's argument that Snap's federal activities must "form[] the basis" of the complaint is not the law. Opening Br. 26 (quoting *Caver*, 845 F.3d at 1144) (alteration added by Florida). The very paragraph Florida cites in *Caver* makes clear that the law "requires only a connection or association between the act in question and the federal office." *Caver*, 845 F.3d at 1144 (quotation marks omitted). Florida's argument, if accepted, would undo Congress's work in amending the statute.

Florida argues that Snap cannot satisfy this test because Snap's "agreements" with DHS and FDA "do not *require* Snap to use [allegedly] addictive features." Opening Br. 26 (emphasis added). But the undisputed record evidence shows that the federal agencies *did* direct Snap to serve content to teenage users in Florida and employ the features Florida calls "addictive." *Supra* pp. 21-22. Florida cites no authority suggesting those directions had to be incorporated into written agreements with the government to satisfy the causal nexus requirement. In any event, the 2011 amendment permitting removal where acts are "related to" the litigation makes clear that there is no requirement that the federal government have specifically required the exact conduct at issue. Florida makes no effort to square its position with the text Congress enacted.[8]

---

[8] The Supreme Court has granted certiorari to determine whether the statute includes such a "contractual direction" requirement. *See Chevron U.S.A., Inc. v. Plaquemines Parish* (U.S. No. 24-813).

Florida's heavy reliance on *State v. Meadows*, 88 F.4th 1331 (11th Cir. 2023), is misguided. *Meadows* held that "a more detailed showing" of the required nexus may be necessary for a "*criminal case*." *Id.* at 1348 (emphasis added and quotation marks omitted). This is not a criminal case. And in any event, *Meadows* explained that the alleged criminal conduct there—election interference by the then-White House chief of staff—was related to "electioneering activity" that was "not part of the executive power" and therefore entirely unrelated to the defendant's federal office. *Id.* at 1349. Here, the "heart of the [complaint]" is that Snap provides service to teenage users through certain features. *Id.* at 1344. As the District Court explained, this lawsuit "seeks to impose liability on Snap for doing just that," including on behalf of the federal government. A577.

Finally, Florida's invocation (at 26) of the generic clause in Snap's agreements with DHS and FDA providing that Snap will not violate "applicable law" has nothing to do with whether the challenged actions are "related to" Snap's federal activities. That argument *presumes* HB3 is valid, which is precisely the federal issue to be adjudicated in this case. Florida's argument would turn the "colorable federal defense" requirement on its head and force Snap to prove its federal defenses before removing. A577; *Watson*, 551 U.S. at 142-143. The Court should reject this distortion of settled precedent and affirm the District Court's order denying remand.

32

## II.    THE DISTRICT COURT CORRECTLY HELD THAT HB3 LIKELY VIOLATES THE FIRST AMENDMENT AS APPLIED TO SNAP.

### A.    HB3 Triggers First Amendment Scrutiny.

Every court to have considered HB3 has rejected Florida's argument that HB3 does not trigger any First Amendment scrutiny.  A581; *CCIA* Stay Order, 2025 WL 3458571, at *3; *CCIA II*, 2025 WL 1570007, at *12.  Rightfully so.  Such scrutiny applies to (1) statutes directly regulating speech or expressive activity and (2) statutes imposing "a disproportionate burden upon those engaged in First Amendment activities."  *TikTok*, 604 U.S. at 68 (quotation marks omitted).  HB3 does both because it directly regulates the protected expression of Snap and its users, and also disproportionately burdens this expression.

### 1.    *HB3 directly regulates protected speech and expression of Snap and its users.*

HB3 directly regulates how Snap compiles speech and how users express themselves on Snapchat.  The Court's scrutiny of the law properly considers both the impact on Snap's users and Snap itself.  *See Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-393 (1988).

Snap's editorial activities are entitled to First Amendment protection.  *Moody*, 603 U.S. at 738.  Just as a newspaper selects and arranges stories for the front page, or a broadcaster decides which programs to air, internet platforms engage in "expressive activity" when they compile, curate, and present third-party speech to users.  *Moody*, 603 U.S. at 738.  The "individual messages may originate with third

33

parties, but the larger offering is" the platform's own "distinctive expressive product." *Moody*, 603 U.S. at 731, 738.

Three aspects of HB3 target "expressive choices" and the law is accordingly subject to First Amendment scrutiny. *Id.* at 738. *First*, HB3 defines a covered platform as one allowing "users to upload content or view the content or activity of other users." Fla. Stat. § 501.1736(1)(e)(1). A regulation that targets media platforms *because* they allow users to view and interact with user-generated content plainly implicates the First Amendment. Such platforms "shape other parties' expression into their own curated speech products," and HB3 targets such platforms on account of those choices. *Moody*, 603 U.S. at 717.

Snapchat is a perfect example. It "allows users to communicate with friends and family using text, audio and video calls, photos, and short videos." A408. Snapchat's "bidirectional" feature intentionally promotes communication among "people who already know each other in real life" and effectuates Snap's value judgment about the types of content and positive interactions it wants to provide for its users. A408 (Snap product director explaining Snapchat's features are designed to "mirror real-life interactions").

These qualities differentiate Snapchat from platforms offering only platform-generated content, such as traditional news media. When HB3 singles out Snapchat for allowing user-generated content, the law necessarily targets Snap's editorial

34

decisions. Regulatory burdens based on a platform's decisions regarding "an edited compilation of third-party expression are subject to judicial review for compliance with the First Amendment." *Moody,* 603 U.S. at 717.

*Second*, HB3 targets platforms that "[e]mploy[] algorithms that analyze user data or information on users to select content for users." Fla. Stat. § 501.1736(1)(e)(3). But an algorithm is simply the way a platform exercises editorial control over its product. *Moody*, 603 U.S. at 718, 735, 744. By "[d]eciding on the third-party speech that will be included in or excluded" "and then organizing and presenting the included items," platforms create "a distinctive expressive product." *Id.* at 731. And the "key" to presenting a unique product is "prioritization of content, achieved through the use of algorithms." *Id.* at 734. Algorithms implement platforms' "set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so)." *Id.* at 734; *see Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (editor's "choice of material" is protected "exercise of editorial control").

Snapchat's "Discover" feature illustrates this point. This feature allows users to access content from vetted publishers and creators. A408-A409. The algorithm pushes this content to users only *after* Snap determines that the content provider can be trusted, that the content meets Snapchat's Community Guidelines, and that it aligns with Snap's interest in promoting a diverse array of content. *Id.*; A411-A412.

Snapchat's algorithm is the modern equivalent of the front page of the *Wall Street Journal*:  It reflects what readers want to see, as well as the editor's judgment about what stories are newsworthy, trustworthy, and reflect the paper's journalistic goals. *See Moody*, 603 U.S. at 731; *Arkansas Educ. TV Comm'n v. Forbes*, 523 U.S. 666, 674 (1998).

By singling out algorithms that "select content for users," Fla. Stat. § 501.1736(1)(e)(3), HB3 targets Snap's "capacity to … filter, prioritize, and label the varied messages, videos, and other content their users wish to post," *Moody*, 603 U.S. at 717.  And because laws that regulate Snap's "choices about the views they will, and will not, convey … interfere with protected speech," targeting Snapchat's algorithm renders HB3 subject to First Amendment review.  *Id.* at 737-738.

*Third*, HB3's regulation of so-called "addictive features" regulates protected expression.  To be clear, HB3 violates the First Amendment by substantially burdening access to fully protected speech even without the regulation of these features, but the law's focus on these features further demonstrates that it requires First Amendment scrutiny.

The first two features are "interactive metrics" and "push notifications," which involve protected speech.  Fla. Stat. § 501.1736(1)(e)(4)(b)-(c); *CCIA II*, 2025 WL 1570007, at *12 n.19.  Interactive metrics show users how they are interacting with other users or content, which necessarily involves speech to convey

36

that message. *CCIA II*, 2025 WL 1570007, at *12 n.19. Indeed, the Ninth Circuit has already held that regulating interactive metrics directly interferes with speech. *NetChoice v. Bonta*, 152 F.4th 1002, 1016 (9th Cir. 2025); *see also In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023) ("There is no dispute that the content of [online platforms'] notifications themselves, such as awards, are speech."). Push notifications are also used to communicate directly with users by providing alerts, encouraging user-to-user communication, and delivering critical safety and account security notifications. A409-410, A412. They also facilitate user-to-user communication by alerting people when they have a new message. *Cf. Bonta*, 152 F.4th at 1016; *In re Social Media*, 702 F. Supp. 3d at 837 ("[T]he First Amendment protects defendants for the timing and clustering of notifications they publish to users regarding content created by defendants themselves.").

The remaining two features—"infinite scrolling" and "[a]uto-play"[9]— concern Snap's expressive product and its efforts to facilitate user speech. Fla. Stat. § 501.1736(1)(e)(4)(a), (d). Laws that regulate an "important medium of expression" are subject to First Amendment scrutiny. *LaCroix*, 38 F.4th at 950 (subjecting ban on "portable signs" to First Amendment scrutiny). HB3 regulates

---

[9] Florida has not alleged that Snapchat utilizes livestreaming, the fifth allegedly "addictive feature." *See* A138-A141.

Snap's ability to shine a light on the most entertaining content on the platform, from anyone across the world, similar to continuous programming on a television channel. At bottom, the regulation of these features implicates the First Amendment because they form part of the "distinctive expressive product" available on Snapchat. *Moody*, 603 U.S. at 731.

2. *HB3 disproportionately burdens protected speech and expression.*

HB3 is also subject to First Amendment review because it disproportionately burdens protected speech. *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1242-43 (11th Cir. 2022).

HB3 imposes direct and substantial burdens on the rights of Snapchat users aged 13-to-15 to engage in and access fully protected speech. It is one of the "fundamental principle[s] of the First Amendment" that "all persons have access to places where they can speak and listen." *Packingham*, 582 U.S. at 104. The First Amendment constrains laws targeting venues for public discourse, such as streets, sidewalks, or public parks. *Frisby v. Schultz,* 487 U.S. 474, 481 (1988) (residential street); *United States v. Grace*, 461 U.S. 171, 179 (1983) (sidewalks); *Ward v. Rock Against Racism*, 491 U.S. 781, 784 (1989) (bandshell). Online speech platforms including Snapchat likewise receive First Amendment protection as "vast democratic forums" of public discourse. *Reno v. ACLU*, 521 U.S. 844, 868 (1997); *accord Packingham*, 582 U.S. at 108.

38

Indeed, Snapchat encourages users to "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Packingham*, 582 U.S. at 105 (quoting *Reno,* 521 U.S. at 870). "[U]sers can debate religion and politics with their friends and neighbors" or "petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-105. As a result, the Supreme Court has recognized that Snapchat and other platforms like it are among "the most important places … for the exchange of views" today. *Packingham*, 582 U.S. at 104. Accordingly, the State cannot prohibit or restrict access to Snapchat without satisfying the First Amendment.

*Packingham* illustrates these principles. There, North Carolina barred certain convicted criminals from "commonplace social media websites" based on the State's asserted interest in protecting young people. *Id.* at 106-107. The Court accepted that North Carolina's interest was significant, but found the law unconstitutional because North Carolina had barred "access to what for many are the principal sources for knowing current events" and "speaking and listening in the modern public square." *Id.* at 107. The Court concluded that foreclosing access to those sites "prevent[ed] the user from engaging in the legitimate exercise of First Amendment rights," subjecting the law to First Amendment scrutiny. *Id.* at 108.

Snapchat shares many essential features of the websites at issue in *Packingham*. 582 U.S at 106-107. Teens use Snapchat "to gain access to

39

information and communicate with one another about it." *Id.* at 107. Moreover, platforms like Snapchat help users stay in touch with friends that they might otherwise have difficulty connecting with, *see CCIA* Stay Order, 2025 WL 3458571, at *14 (Rosenbaum, dissenting), and features like Snapchat's default ephemerality function encourage users to express "a more authentic, unpolished, and spontaneous side of themselves," A408. Florida's law therefore burdens teens "from engaging in the legitimate exercise of First Amendment rights" and is subject to First Amendment scrutiny. *Packingham*, 582 U.S at 108.

HB3 is also subject to First Amendment scrutiny because it disproportionately burdens adults' access to protected speech. Just last term, the Supreme Court reaffirmed that requiring adults to submit "proof of age" before accessing speech "is a burden on the exercise" of their First Amendment rights. *Free Speech Coal. v. Paxton*, 606 U.S. 461, 483 (2025); *see* CCIA Stay Order, at *19. Such burdens "discourage users from accessing [the regulated] sites" and chill speech. *Reno*, 521 U.S. at 856. Here, although HB3 does not expressly require age verification for all users, Florida's regulations strongly incentivize platforms to adopt age assurance measures. *Supra* p. 7. That burden triggers First Amendment scrutiny.

### 3. *Florida cannot recast HB3 as a regulation of nonexpressive activity.*

Florida claims HB3 regulates only the "nonexpressive conduct" of "contracting with certain minors." Opening Br. 30-31. This argument is too clever

40

by half; the "contract" is to participate in Snapchat's forum for speech.  *CCIA II*, 2025 WL 1570007, at *12 ("creation of a social media account" is "inextricable from … accessing a forum for speech").  The State could not plausibly escape First Amendment scrutiny for a law purporting to ban the "conduct" of "purchasing" a newspaper; the same is true here.  *Id.* at *11 n.16; *see Honeyfund.com v. Governor of Fla.*, 94 F.4th 1272, 1278 (11th Cir. 2024) (rejecting similar effort by Florida to recast speech regulation as conduct regulation).

States may subject businesses "to generally applicable economic regulations without creating constitutional problems."  *Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 581 (1983).  But HB3 is not "generally applicable."  It does not apply to all websites or online businesses—only online platforms that host speech.  *Id.* at 581-583 (First Amendment applied because Minnesota improperly "singled out the press for special treatment").  Such "differential" treatment is subject to constitutional scrutiny.  *Id.* at 585.

Florida's reliance (at 31-32) on cases involving underage access to establishments that serve alcohol is not persuasive.  The act of purchasing alcohol does not have an expressive component, so States may generally regulate access to such spaces even when it imposes incidental burdens on speech.  *See Indigo Room, Inc. v. City of Ft. Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013); *Gary v. City of Warner Robins*, 311 F.3d 1334, 1340 (11th Cir. 2002).  Here, by contrast, HB3

41

applies solely to platforms that host speech, and precisely because they host speech. Fla. Stat. § 501.1736(1)(e)(1).

**B.    HB3 Is Subject To, And Cannot Withstand, Strict Scrutiny.**

Laws that "target speech based on its communicative content" trigger strict scrutiny, as do content-neutral laws that cannot be "justified without reference to the content of the regulated speech." *Reed*, 576 U.S. at 163-164 (quotation marks omitted). "Because speech restrictions based on the identity of the speaker are all too often simply a means to control content," moreover, "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (quotation marks and alteration omitted). HB3 is subject to strict scrutiny under any of these standards. And if the Court concludes strict scrutiny applies, that is sufficient to affirm; Florida has never argued—below or on appeal—that HB3 could survive strict scrutiny.

HB3's text demonstrates it is a content-based restriction: It applies only to platforms that allow "users to upload content"; platforms that solely generate their own content are exempt. Fla. Stat. § 501.1736(1)(e)(1). In other words, the law targets "social" media—a specific type of media, with content generated by users. A CNN story about breaking news avoids the law's strictures; a Snapchat user's video story expressing her opinion on that news does not. The law thus privileges

42

traditional content—such as mainstream news stories—over news shared by, and opinions and views of, individual, ordinary people, including teenagers.

HB3 thus "single[s] out" user-generated content "for differential treatment." *City of Austin v. Reagan Nat'l Ad. of Austin, LLC*, 596 U.S. 61, 71 (2022). Courts around the country have repeatedly recognized as much, concluding that laws targeting social speech are content-based and subject to strict scrutiny. *See, e.g.*, *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 592 (W.D. Tex. 2025); *NetChoice v. Reyes*, 748 F. Supp. 3d 1105, 1122 (D. Utah 2024); *NetChoice v. Yost*, 778 F. Supp. 3d 923, 953 (S.D. Ohio 2025). These cases properly recognize that a law is not content-neutral when it targets only platforms "whose primary function is to share and broadcast social speech." *Paxton*, 765 F. Supp. 3d at 592.

A platform's decision about whether it will host user-generated content, moreover, is a choice that contributes to a speech platform's "distinctive expressive product." *Moody*, 603 U.S. at 731-732. HB3 targets a platform's editorial decision to rely on curated user-generated content. *CCIA* Stay Order, 2025 WL 3458571, at *15 (Rosenbaum, dissenting); *Yost*, 778 F. Supp. 3d at 953. Florida thus permits platforms that solely share the platform's own content to interact with teenagers and even include so-called addictive features—for example, various mainstream news apps (which often include infinite-scroll video content produced directly by that news organization)—while regulating platforms that share user-generated messages

and content. Laws, such as HB3, that define "regulated speech by its function"—here, facilitating user-to-user speech—draw content-based distinctions subject to strict scrutiny. *Reed*, 576 U.S. at 163-164.

The *CCIA* stay panel concluded that HB3 likely targets "a *form* of expression, not a *subject matter*," emphasizing that HB3 does not regulate "certain topics or viewpoints." *See CCIA* Stay Order, 2025 WL 3458571, at *4. That is wrong: The content of user-generated speech is different from other forms of speech. A teenager does not open Snapchat and expect to find the same content as a traditional newspaper. She expects to find messages from friends and content created by users, publishers, and brands based on her interests. Even if HB3's "restrictions on speech" could "be seen as viewpoint neutral … that does not mean that they are content-neutral." *Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1307-08 (11th Cir. 2017); *see Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1225 & n.10 (11th Cir. 2017).

At minimum, HB3's application to "user-generated content," as opposed to other forms of content, is an impermissible speaker-based distinction. A "legislature is constitutionally disqualified from dictating" "the speakers who may address a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-785 (1978). HB3 permits certain speakers (such as mainstream media), but bans or restricts *individual people*—and particularly *individual teenagers*—from speaking. As the

44

Supreme Court explained in *Reed*, "a law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based."  576 U.S. at 170.  The same is true here—a law that limits solely "social" content cannot "evade strict scrutiny" simply because it applies only to "social media platforms."  *Id.*

The history of HB3 demonstrates, moreover, that "the legislature's speaker preference reflects a content preference."  *Id.*  At the signing ceremony for HB3, the Speaker of the Florida House stated that HB3 would prevent platforms from "curating *content* for your children which is encouraging them to stay on for just a few more hours longer every day *and is leading them and nudging them in a particular direction*."  *Press Conference: Governor Ron DeSantis Signs HB3 to Protect Children from the Harms of Social Media* (Mar. 25, 2024), at 6:00-6:23, https://perma.cc/QKJ6-BPZ2 (emphasis added).  In the *CCIA* case, Florida has likewise described what is prohibited by HB3 as an "entertainment-based service" that allows users "to see what other [users] were watching"—making clear that Florida seeks to restrict teenagers from accessing "entertainment-based" content.  No. 4:24-cv-00438, ECF No. 71 at 29:5-9.  Especially at this stage, where Florida must make a "clear showing" that it is entitled to the "extraordinary remedy" of a preliminary injunction, this Court should deny Florida's requested relief.  *Swain v. Junior*, 961 F.3d 1276, 1293-94 (11th Cir. 2020) (quotation marks omitted).

HB3 is also a content-based restriction on speech because it expressly targets platforms, like Snapchat, that "[e]mploy algorithms." Fla. Stat. § 501.1736(1)(e)(3). An algorithm is a proprietary means of displaying content, which (in Snap's case) seeks to provide users with content that Snap believes will allow users to express themselves, live in the moment, learn about the world, and have fun together. Regulating Snap because it uses an algorithm triggers strict scrutiny because the State is restricting Snap's ability to make editorial decisions about what content users should view. *See Moody*, 603 U.S. at 731-732; *supra* pp. 34-35.

HB3's restrictions on interactive metrics and push notifications likewise trigger strict scrutiny. An interactive metric "indicate[s] the number of times other users have clicked a button or indicate[s] their reaction to content." Fla. Stat. § 501.1736(1)(e)(4)(c). A restriction on interactive metrics is content-based, because it applies only to *specific information* about the user's activities that the State does not want the user to have. Restrictions on "[p]ush notifications" are likewise content-based because they impact the speech Snap shares with its users "about specific activities or events related to the user's account." *Id.* § 501.1736(1)(e)(4)(b). As the Ninth Circuit has recognized, these types of provisions are facially content-based and therefore trigger strict scrutiny. *Bonta*, 152 F.4th at 1016.

The State's belief that these features have negative effects on teens does not mean the State can bypass strict scrutiny. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123, 134 (1992). And "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-213 (1975).

## C.    HB3 Cannot Survive Even Intermediate Scrutiny.

Even if intermediate scrutiny applies, HB3 cannot pass muster. The law forecloses an important medium of expression without leaving adequate alternatives available; burdens vastly more protected speech than necessary; and does not meaningfully advance the State's asserted interest.

### 1.    *HB3 entirely forecloses an important medium of expression.*

This Court has recognized that a law fails intermediate scrutiny when it "entirely foreclose[s]" a "venerable means of communication that is both unique and important." *LaCroix*, 38 F.4th at 950-951 (quotation marks omitted). HB3 fails this test. *See CCIA II*, 2025 WL 1570007, at *15. The Supreme Court has recognized the importance of platforms like Snapchat for effective modern communications. *Packingham*, 582 U.S. at 104. Yet HB3 flatly prohibits 13-year-olds from accessing Snapchat and other covered "social media" sites and prohibits 14- and 15-year-olds

from accessing those sites without parental consent. It also requires Snap to terminate all existing accounts for these users and permanently delete their data. As to those users, the immediate effect of HB3 would be to foreclose access to Snapchat altogether.

It makes no difference that HB3 directly forecloses speech only for 13-year-olds, and for those aged 14-to-15 without parental consent. It is undisputed that Snapchat hosts vast amounts of speech that is fully protected as to teens—indeed, the State is forbidden from creating "new categories of unprotected speech" even for teens. *Brown*, 564 U.S. at 791. In *Packingham*, the Supreme Court held that a law failed intermediate scrutiny where it foreclosed social-media access as to certain convicted criminals. 582 U.S. at 105, 109. Foreclosing access to these important media channels as to teens is surely *at least* as constitutionally problematic. That is particularly true here, where the State seeks to restrict access to speech *because* teens find it compelling. The "fear that speech might persuade provides no lawful basis for quieting it." *Sorrell v. IMS Health*, 564 U.S. 552, 576 (2011).

Nor can Florida rely on the possibility that parents might consent to override HB3's ban as to 14- and 15-year-olds. In *Brown*, the Supreme Court squarely rejected the argument that "the state has the power to prevent children from hearing or saying anything *without their parents' prior consent*." 564 U.S. at 795 n.3.

48

Accepting a contrary proposition would mean States could prohibit teens from accessing political rallies or religious services without their parents' consent.

The *CCIA* stay panel tried to distinguish *Brown* as "inapplicable to an intermediate scrutiny analysis." 2025 WL 3458571, at *8 n.10. But it provided no explanation for that distinction in the context of the Court's discussion of parental-consent requirements, and there is none. Indeed, the parental-consent requirement here precludes access to far more protected speech—of far more value—than the violent video games in *Brown*. If parents cannot be required to give their consent before teens access violent video games, then they cannot be required to provide consent before teens access speech regarding "religion and politics," among many other types of speech on Snapchat. *Packingham*, 582 U.S. at 104-105.

Florida claims (at 40) that HB3 is justified by the "'compelling' government interest" in "protecting the physical and psychological well-being" of teenagers. The same rationale, however, has been used for more than a century by those seeking to restrict children's access to media. In the 1880s, dime novels were labeled "devil-traps for the young" that inspired "all of the antisocial behavior exhibited by the youth of the day." Margaret A. Blanchard, *The American Urge to Censor*, 33 Wm. & Mary L. Rev. 741, 757 (1992). In the 1940s, pediatricians found that a majority of children had a "severe addiction" to "horror" movies and radio crime dramas. *See* Mary I. Preston, *Children's Reactions to Movie Horrors and Radio Crime*, 19 J.

49

Pediatrics 145, 147-149 (1941).  In the 1950s, New York determined that "motion pictures possess a greater capacity for evil, particularly among the youth of a community, than other modes of expression," *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 502 (1952), while Los Angeles concluded that "[m]any children have been incited to commit crimes as a consequence of looking at crime 'comic' books," *Katzev v. County of Los Angeles*, 341 P.2d 310, 312 (Cal. 1959) (striking down law on First Amendment grounds).  In the 2010s, California reached similar conclusions about violent video games.  *See Brown*, 564 U.S. at 799 (same).  The First Amendment does not permit States to restrict access to books, movies, or video games on the ground that such media is allegedly "harmful" to children; the same is true of online speech platforms.

> 2.    *HB3 does not leave open adequate alternative channels.*

HB3 also fails intermediate scrutiny because it "does not leave open alternative channels of communication."  *LaCroix*, 38 F.4th at 945.  To satisfy intermediate scrutiny, "the alternative channel (or channels) must be adequate and meaningful."  *Id.* at 952.  "The speaker must be able to effectively communicate his message to the intended audience in face of the [law's] restrictions."  *Id.* at 952.

HB3 expressly *forecloses* users' ability to access "adequate and meaningful" alternative forums.  By its terms, HB3 applies to otherwise covered platforms where 15-and-under usage exceeds a certain number of average hours per day.  *See* Fla.

50

Stat. § 501.1736(1)(b), (e)(2).  HB3 thus targets major online platforms precisely because they are the *most popular* forums for protected speech.  This means that if teens begin using a *different* platform because they can no longer access their first-choice platforms, as soon as that new platform becomes popular, it too will be banned.  HB3 is thus expressly designed to prohibit teens from accessing alternatives.

HB3 singles out platforms, moreover, that employ tools—such as algorithmic content selection—that make the platform effective at connecting users to the content that they are most interested in.  *See id.*  Although Florida and the *CCIA* stay panel suggested that teens may simply redirect their speech to other online platforms, neither identifies any existing platform that is remotely comparable in terms of how "effectively" teens may "communicate [their] message to the intended audience." *LaCroix*, 38 F.4th at 945.  Again, HB3 is designed to *foreclose* access to alternative forums with similarly engaging content.

Comparing this case to *LaCroix* drives home the point.  There, the Court recognized that a ban on portable signs failed intermediate scrutiny even though the city's ordinance permitted other signs.  *Id.* at 952.  The Court held that portable signs had unique value because they "are inexpensive, they are easy to create and customize, and they can reach a wide variety of listeners." *Id.*  The same is true of Snapchat and other covered platforms:  They are inexpensive (in Snapchat's case,

51

free); allow users a "canvas of expression" they can "create and customize"; and facilitate reaching "a wide variety of listeners." *Id.* The State has identified no adequate replacement that HB3 leaves available. Indeed, as soon as any adequate replacement became popular, it too would be banned.

   3.   *HB3 burdens substantially more speech than necessary.*

Even if HB3 does "not entirely foreclose" an important "medium of expression," it still fails intermediate scrutiny because it is not "narrowly tailored to serve a significant governmental interest." *LaCroix*, 38 F.4th at 950. On the contrary, HB3 "burdens substantially more speech … than is necessary to achieve the government's asserted interest." *Florida Preborn Rescue*, 161 F.4th at 744.

First, HB3 imposes extreme burdens on teens' ability to access fully protected speech. As the District Court observed, HB3 is an "extraordinarily blunt" instrument for resolving the issue of excessive social-media use. *CCIA II*, 2025 WL 1570007, at *15. Its solution is to presumptively bar *all* access to *all* services for *all* Florida Snapchat users aged 13-to-15, regardless of whether their parents have adopted parental controls or screen time management, regardless of whether the user engages with so-called "addictive" features, and regardless of the amount of time they actually spend on Snapchat.

The State has not even attempted to explain why an approach that is less restrictive of speech would be inadequate to address its asserted interests. *See*

*Florida Preborn Rescue*, 161 F.4th at 744.  Parents have many ways to restrict teens from accessing online speech platforms, including refusing to purchase a "smart" phone, limiting phone or app use, and using a host of parental controls available through operating systems, internet providers, and individual platforms (including Snap's Family Center).  *See* A410-411.[10]  To the extent the State's real complaint is that parents aren't sufficiently aware of these options, or don't view them as sufficiently important, the State could launch a marketing campaign to raise awareness about parental controls and limiting screen time for teens.  The State has already taken steps, moreover, to restrict phone use in schools, *see* Fla. Stat. § 1006.07(2)(f), and it could devote additional resources to address teen mental health.  Far from being "irrelevant" as the State contends (at 41), this Court has recently reaffirmed that the State's failure to consider such less restrictive alternatives is "[d]ispositive[]" of the question whether the law survives intermediate scrutiny.  *Florida Preborn Rescue*, 161 F.4th at 744.

Second, HB3 imposes substantial burdens on *adults*' protected ability to access speech on Snapchat, and in particular to participate in online speech without disclosing sensitive personal information about their identity.  Although HB3 does not expressly require age verification, Florida's regulations strongly incentivize

---

[10] Snap's Family Center gives parents visibility into the time their teens spend on the platform, including across various features, as well as friend connections.  *See* Parents - Family Center, Snapchat, https://parents.snapchat.com/family-center.

platforms to adopt age assurance measures to avoid a finding of "willful" disregard, which can trigger even more substantial penalties than the already-steep $50,000-per-violation. *See* Fla. Admin. Code R. 2-43.002. As the Supreme Court has recognized, age-verification "inevitably curtail[s] a significant amount of adult communication on the Internet." *Reno*, 521 U.S. at 877. Age verification also threatens adults' right to speak anonymously by requiring them to hand over sensitive personal information. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341-342 (1995) (discussing value of anonymous speech).

Although a separate statutory provision refers to the possibility of anonymous age verification, *see* Fla. Stat. § 501.1738, Florida has not made any showing that any service meeting its standards for "anonymous age verification" actually exists. *Cf. Reno*, 521 U.S. at 881 (striking down age-verification requirements where "proposed screening software does not currently exist"). And other parts of HB3 exacerbate privacy concerns by *permitting* the State to "disclose[]" any information gathered when investigating violations of HB3 to "another government entity" or even under certain circumstances for "print, publication, or broadcast" "[d]uring an active investigation." Fla. Stat. § 501.1736(11)(b). "This potentially unlimited data-sharing poses substantial chilling concerns for all Snapchat users who wish to speak—and, especially, to voice dissent—on these platforms." *CCIA* Stay Order, 2025 WL 3458571, at *20 (Rosenbaum, dissenting).

54

The *CCIA* stay panel read the Supreme Court's decision in *Free Speech Coalition* to mean that "in the modern world, the age verification" burden is "modest." 2025 WL 3458571, at *8 n.11. But *Free Speech Coalition* addressed a law that required age-verification *only* as to speech that is "obscene as to minors"; it did not consider the extent to which a blanket age-verification requirement for *all* covered sites would burden adult speech. 606 U.S. at 481, 487. Indeed, the court expressly noted that the law "does not require age verification on other sites, such as search engines and social-media websites." *Id.* at 498. *Free Speech Coalition* does not undermine longstanding precedent holding that age-verification requirements for vast amounts of *fully protected* speech impose far more significant burdens. *Reno*, 521 U.S. at 877.

4.    *HB3 does not further Florida's asserted interests.*

Finally, as Judge Rosenbaum recognized, Florida has not made the "strong showing" that HB3 furthers Florida's legitimate interests necessary to obtain a preliminary injunction. *CCIA* Stay Order, 2025 WL 3458571, at *20. Although a "law need not be the least restrictive or least intrusive means of serving the government's interests," a law fails this aspect of the test where "a substantial portion of the burden on speech does not serve to advance its goals." *Florida Preborn Rescue*, 161 F.4th at 739-740.

Here, the State has chosen to target allegedly "addictive" features only for the most popular services. These so-called "addictive features" are permitted on any site or app that is not sufficiently popular, that does not require users to create an account, or that does not involve "social" speech. The law apparently permits video games—regardless of how much time teens spend on such games. As the Supreme Court has recognized, a law riddled with such exceptions is "not how one addresses" what the State believes is "a serious social problem." *Brown*, 564 U.S. at 802. Even if intermediate scrutiny is primarily concerned with "regulations that are overinclusive, not underinclusive," *Wacko's Too, Inc. v. City of Jacksonville*, 134 F.4th 1178, 1190 (11th Cir. 2025), these "[e]xemptions" are still relevant because they "diminish the credibility of the government's rationale for restricting speech in the first place." *City of Ladue v. Galileo*, 512 U.S. 43, 52-53 (1994). As Judge Rosenbaum put it in her *CCIA* dissent, if "Florida's purpose was truly … the [purported] harms of minors' compulsive social media use[,] then the law should *actually target those effects*, and not merely operate to limit expression." 2025 WL 3458571, at *20.

In short, HB3 burdens vastly more protected speech than necessary, only questionably serves HB3's purported goals, and does not leave any meaningful alternative channels available. It therefore fails intermediate scrutiny.

## III. THIS COURT SHOULD NOT DIRECT THE DISTRICT COURT TO REMAND OR ENTER A PRELIMINARY INJUNCTION.

Florida asks this Court to reverse and remand "with instructions" to remand to state court or enter a preliminary injunction. Opening Br. 48. This Court should reject that invitation even if it disagrees with the District Court and Snap. As to both issues, Snap has fully preserved alternative arguments that were not adjudicated. *See* A567 n.1 (noting without deciding Snap's argument for diversity jurisdiction); Dist. Ct. Dkt. No. 32, at 21-28 (arguing HB3 violates the Dormant Commerce Clause and Children's Online Privacy Protection Act). This Court should follow its ordinary course and remand those issues for consideration by the District Court in the first instance. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1128 (11th Cir. 2022) (vacating denial of preliminary injunction in First Amendment case and remanding for adjudication of additional defenses). Florida did not raise those alternative arguments in its opening brief, moreover, and has thus forfeited any basis to ask the Court to address them on appeal. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).

Remanding for further consideration would obviate the need for this Court to address the equitable factors for granting a preliminary injunction. *See* Opening Br. 47-48. If the Court addresses them, however, it should find that Florida has failed to show that the equitable factors favor Florida in this preliminary posture. Florida's arguments on the equitable factors depend entirely on the First Amendment issues.

*See id.*  In this preliminary posture, Florida provides no justification for immediately depriving Snapchat users from accessing vast quantities of fully protected speech before a full trial on the merits—particularly given Snap's strong likelihood of success in demonstrating a First Amendment violation.  The District Court, moreover, has not addressed whether HB3 violates federal law on other grounds not before this Court, which were raised by Snap below but have not been adjudicated, nor has it addressed the balance of the equities.  The District Court should address the equitable factors if necessary in the first instance on remand once all defenses have been fully litigated.

## CONCLUSION

For the foregoing reasons and those in Snap's response to the Court's jurisdictional question, this Court should affirm the District Court's order denying a preliminary injunction and dismiss Florida's appeal as to the order denying a motion to remand or—in the alternative—affirm as to that order as well.

Respectfully submitted,

Christopher M. Kise                  /s/ Katherine B. Wellington
Lazaro P. Fields                     Katherine B. Wellington
CONTINENTAL PLLC                     HOGAN LOVELLS US LLP
101 N. Monroe Street, Suite 750      125 High Street, Suite 2010
Tallahassee, FL 32301                Boston, MA 02110
Tel.: (850) 332-0702                 Tel.: (617) 702-7745
                                     katherine.wellington@hoganlovells.com

                                     Reedy C. Swanson
                                     HOGAN LOVELLS US LLP
                                     555 13th St. NW
                                     Washington, DC 20004
                                     Tel.: (202) 637-5764

February 9, 2026          *Counsel for Appellee Snap Inc.*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume requirement of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,959 words.

2.      This document complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14-point font.

/s/ Katherine B. Wellington
Katherine B. Wellington

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2026, I caused a copy of the foregoing to be served by electronic means via the Court's CM/ECF system on all counsel registered to receive electronic notices.

/s/ Katherine B. Wellington
Katherine B. Wellington