**NOT FOR PUBLICATION**

In the
# United States Court of Appeals
For the Eleventh Circuit

---

No. 25-12814

---

ATTORNEY GENERAL, STATE OF FLORIDA,
DEPARTMENT OF LEGAL AFFAIRS,

*Plaintiff-Appellant,*

*versus*

SNAP INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:25-cv-00676-MW-HTC

---

Before NEWSOM, LUCK, and TJOFLAT, Circuit Judges.

PER CURIAM:

With the rise of social media usage comes concern about its impact on the mental health of its users, particularly adolescents. In response to this growing concern, Florida's legislature enacted a

law to regulate social media platforms that use addictive features. This case arises from the State's attempt to enforce that law. While the law raises serious constitutional questions, we do not reach them because the District Court lacked subject matter jurisdiction over this case.

## I. BACKGROUND

The Florida legislature enacted House Bill 3 ("HB3") in 2024. H.B. 3, 2024 Leg., Reg. Sess. (Fla. 2024) (codified in relevant part in Fla. Stat. § 501.1736). HB3 requires qualifying social media platforms to prohibit minors from entering contracts to become account holders.[1] *Id.* § 501.1736(2)(1). A social media platform qualifies under the statute if it meets certain criteria and employs one of five "addictive" features.[2]

[1] The law requires platforms to prohibit minors younger than 14 from becoming account holders. Fla. Stat. § 501.1736(2)(a)–(b)(1). It allows minors aged 14 or 15 to become account holders with consent from the minor's parent or guardian. *Id.* § 501.1736(3)(a)–(b)(1).

[2] Section 501.1736 states, in relevant part:

> (e) "Social media platform" means an online forum, website, or application that satisfies each of the following criteria:
>
> 1. Allows users to upload content or view the content or activity of other users;
>
> 2. Ten percent or more of the daily users who are younger than 16 years of age spend on average 2 hours per day or longer on the online forum, website, or application on the days when using the online forum, website or application during the previous 12 months or, if the online forum, website, or application

The statute went into effect on January 1, 2025, authorizing the Office of the Attorney General's Department of Legal Affairs (the "Department") to bring civil actions to enforce HB3 against qualifying platforms and impose monetary sanctions "of up to

---

did not exist during the previous 12 months, during the previous month;

3. Employs algorithms that analyze user data or information on users to select content for users; and

4. Has any of the following addictive features:

a. Infinite scrolling, which means either:

(I) Continuously loading content, or content that loads as the user scrolls down the page without the need to open a separate page; or

(II) Seamless content, or the use of pages with no visible or apparent end or page breaks.

b. Push notifications or alerts sent by the online forum, website, or application to inform a user about specific activities or events related to the user's account.

c. Displays personal interactive metrics that indicate the number of times other users have clicked a button to indicate their reaction to content or have shared or reposted the content.

d. Auto-play video or video that begins to play without the user first clicking on the video or on a play button for that video.

e. Live-streaming or a function that allows a user or advertiser to broadcast live video content in real-time.

Fla. Stat. § 501.1736(1)(e)

$50,000 per violation" and, in some cases, punitive damages. Fla. Stat. § 501.1736(5).

In April 2025, the Department brought such an enforcement action against Snap Inc., the operator of the popular social media platform known as Snapchat. The complaint alleged Snap, a qualifying platform under the statute, was "openly defying" HB3 by contracting with minors under the age of 14. The Department sued Snap in Florida state court for violating HB3 and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). It sought, among other things, injunctive relief, civil penalties, and punitive damages.

### *A. Removal to Federal Court*

Snap filed a notice of removal in the Northern District of Florida, arguing the Court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) and the federal officer removal statute, which allows removal of actions against any person "acting under [a federal] officer . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The Department moved for remand.

#### 1. Federal Officer Removal

Snap argued the Department's claims were removable under the federal officer removal statute because Snap provided advertising services to two federal agencies: the Department of Homeland Security ("DHS") and the Food and Drug Administration ("FDA"). It asserted the Department's claims "interfere with Snap's ability to carry out its responsibilities" under DHS and FDA

officers, and it argued HB3 "would penalize Snap for its work assisting the federal government in accomplishing its goals of reaching teenage audiences" with the advertisements.

Snap purportedly entered into memorandums of understanding ("MOUs") with DHS's Cyber Crimes Center and Child Exploitation Investigations Unit to help DHS develop its "Know2Protect" campaign—a public safety initiative directed at educating teenagers and adults about online safety and preventing child sexual exploitation and abuse.[3] DHS purportedly handpicked Snap to help carry out the campaign because of the platform's ability to reach "one of the campaign's key audiences: teens." Under the MOUs, Snap conducted research on young adults' awareness of child exploitation risks and developed advertising features to "bring important online safety information to [the teen] community directly."

Similarly, Snap contends that it assisted with public health campaigns for the FDA's Center for Tobacco Products. The campaigns targeted audiences of 13 to 17 with messages about the risks of vaping and cigarette use.[4] The FDA contracted with a third-party media agency to create advertising campaigns with SNAP. Specifically, in the lead up to the FDA's 2025 campaigns, the marketing agency provided Snap with briefs explaining the FDA's goals for

---

[3] Snap states that DHS carries out the Know2Protect campaign in furtherance of its child exploitation prevention responsibilities under 6 U.S.C. § 473.

[4] Snap alleged that the FDA carried out this advertisement campaign pursuant to its duties under 21 U.S.C. §§ 393(d)(2)(D) and 387a(e).

the campaigns. Snap then submitted proposals for the campaigns and explained how its proprietary algorithms could help the FDA reach their intended audience. After receiving FDA approval, the marketing agency purchased advertising from Snap for one of the campaigns.

The Department moved to remand, arguing (1) Snap's "brief partnership[s]" with DHS, the FDA, and their contractors came "nowhere near the deep and enduring ties, control, and supervision" required to establish Snap "act[ed] under" a federal officer, (2) Snap failed to provide any evidence to support its allegations of federal officer jurisdiction, and (3) Snap failed to show that the conduct for which it was being sued was performed under color of federal law.

**2. Diversity Jurisdiction**

Snap also argued the Department's claims were removable under diversity jurisdiction. Because the relief the Department sought was "allegedly for the direct benefit of identifiable, individual Florida citizens," Snap argued "the citizenship of those individuals control[led] for the purposes of diversity."

In its motion for remand, the Department responded that it brought the suit pursuant to its statutory mandate to enforce the laws at issue. It also pointed out that it sought injunctive and punitive relief, making clear the aim of the suit was to bring a benefit to the State by "deterring future violations by Snap or other wrongdoers." The Department contended that this meant the interested party was the State of Florida.

### *B. The Department's Motion for Temporary Injunction*

The Department also asked the District Court to temporarily enjoin Snap from violating HB3. It argued the Attorney General had a legal right to an injunction because Snap was openly violating HB3 and the enforcement of HB3 does not violate the First Amendment.

Snap responded that the Department's injunction argument was foreclosed by the District Court's recent order in *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 826 F.Supp.3d 1358 (N.D. Fla. 2025) ("CCIA"). In that case, which was filed prior to the instant suit, two nonprofit associations representing internet and technology companies sued for a declaration that HB3 violates the First Amendment and sought preliminary and permanent injunctions barring the Florida Attorney General from enforcing it. *Id.* The District Court found HB3 is likely unconstitutional and preliminary enjoined its enforcement.[5] *Id.* at 1390.

Snap also argued the Department failed to show a likelihood of success on the merits because HB3 violates the First Amendment and the Commerce Clause and is preempted by the Children's Online Privacy Protection Act.

[5] That decision is currently on appeal before this Court.

* * *

The District Court sided with Snap on both motions. It denied the Department's motion to remand, finding that Snap established the three elements required for federal officer removal based on its relationships with DHS and the FDA. It also denied the Department's motion for temporary injunction, relying on its finding in *CCIA* that HB3 was likely unconstitutional. The Department timely appeals both denials.

## II. DISCUSSION

This case requires us to answer three questions: (1) Do we have jurisdiction to hear this appeal? (2) Was the case properly removed to federal court under the federal officer removal statute? (3) And, if not, is additional fact-finding required to determine if the case was properly removed to federal court under diversity jurisdiction? We answer each question in turn.

### *A. Appellate Jurisdiction*

We are obligated to inquire sua sponte into our own jurisdiction to hear an appeal. *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814, 818 (11th Cir. 2010). Appellate courts have jurisdiction over appeals of final orders of the district courts and certain nonfinal orders, including those denying injunctions. 28 U.S.C. §§ 1291, 1292(a)(1). Congress specifically vested appellate courts with jurisdiction over appeals of orders remanding cases to state court pursuant to the federal officer removal statute. *Id.* §§ 1447(d), 1442. However, Congress is silent as to whether we have jurisdiction over appeals of orders denying such remands. While "such an

order is not final and appealable if standing alone," it is less clear whether we can review the order when it is appealed in conjunction with an independently appealable order. *Chicago, R.I. & P.R. Co. v. Stude*, 346 U.S. 574, 578, 74 S. Ct. 290, 293 (1954); *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 74, 117 S. Ct. 467, 475 (1996). That question is a matter of first impression in our Court. *See MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234 (11th Cir. 2005) (reviewing a remand denial appealed alongside the denial of an injunction without addressing this question). We look to our sister circuits for guidance.

The Second, Fifth, Sixth, and Ninth Circuits, representing the majority of Circuits that have weighed in on this issue, have found that, when reviewing an otherwise appealable order, appellate courts *must* consider whether the order denying remand was proper because "the remand question is jurisdictional." *Kysor Indus. Corp. v. Pet, Inc.*, 459 F.2d 1010, 1011 (6th Cir. 1972); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007); *Takeda v. Nw. Nat. Life Ins. Co.*, 765 F.2d 815, 818 (9th Cir. 1985); *PCI Transp., Inc. v. Fort Worth & W. R. Co.*, 418 F.3d 535, 539–40 (5th Cir. 2005). In *MTBE*, the Second Circuit explained that, on appeal, "'the first and fundamental question is that of jurisdiction, first, of [the appellate] court, and then of the court from which the record comes,'" and that "[t]his obligation is not extinguished because an appeal is taken on an interlocutory basis and not from a final judgment." *In re MTBE Prods. Liab. Litig.*, 488 F.3d at 121–22 (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453, 20 S. Ct. 690, 692 (1990)). Were an appellate court to assume it has

jurisdiction on appeal, it would risk "compound[ing] [the] error of the district court." *Id.* at 122.

A minority of Circuits disagree. The Seventh and Tenth Circuits have found that we *may* consider the denial of remand under our pendent appellate jurisdiction.[6] *Ne. Rural Elec. Membership Corp. v. Wabash Valley Power Ass'n, Inc.*, 707 F.3d 883, 886 (7th Cir. 2013), *as amended* (Apr. 29, 2013); *Oklahoma ex rel. Edmondson v. Magnolia Marine Transp. Co.*, 359 F.3d 1237, 1239 (10th Cir. 2004); *see also Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51, 115 S. Ct. 1203, 1212 (1995). The minority position views the appealable order and the order denying remand as inextricably intertwined because the orders "present[] precisely the same question of subject matter jurisdiction." *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 886. The denial of remand is thus subject to appellate review under our pendent appellate jurisdiction. Thus, these Circuits differ by finding the review to be discretionary.

We join the majority of circuits for multiple reasons. First, we agree that by ignoring the jurisdictional question, we would risk going beyond "the bounds the Constitution and Congress have prescribed." *In re MTBE Prods. Liab. Litig.*, 488 F.3d at 121. Second, though the appealable order and the order denying remand present

[6] Pendent appellate jurisdiction allows us to review non-appealable decisions that are "inextricably intertwined" with an appealable decision or that must be reviewed to ensure meaningful review of an appealable decision. *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 886.

the same subject matter jurisdiction question, *Ne. Rural Elec. Membership Corp.*, 707 F.3d at 886, it is unclear whether the Supreme Court meant for pendent appellate jurisdiction to extend to that question. *In re MTBE Prods. Liab. Litig.*, 488 F.3d at 122. Because, "the district court in *Swint* had subject matter jurisdiction over the collateral order on appeal, the Supreme Court did not have occasion to address whether its holding applied to the special subset of cases in which the district court did not have subject matter jurisdiction." *Id.* Thus, we hold that, in cases removed to federal court under the federal officer removal statute, we must review an order denying remand to state court when appealed in conjunction with another appealable order as part of our independent obligation to satisfy ourselves of our jurisdiction and the jurisdiction of the court below.

Here, the appeal of the order denying the Department's request for an injunction against Snap is explicitly within our jurisdiction under 28 U.S.C. § 1292(a)(1). With that, the appeal of the order denying the Department's motion to remand to state court is within our jurisdiction under our independent obligation to confirm our jurisdiction and the jurisdiction of the lower court. We have jurisdiction over this appeal, and we move to the next question presented.

### *B. Officer Removal Jurisdiction*

The District Court denied Snap's motion to remand based on federal officer removal grounds. "Because it involves questions

of federal subject matter jurisdiction, we review the denial of a motion to remand a removed state court action *de novo*." *Bailey v. Janssen Pharmaceutica, Inc.*, 536 F.3d 1202, 1204 (11th Cir. 2008).

As the Supreme Court first articulated in 1879, federal officer removal is predicated on the principle that "[n]o State government can exclude [the federal government] from the exercise of any authority conferred upon it by the Constitution, obstruct its authorized officers against its will, or withhold from it, for a moment, the cognizance of any subject which that instrument has committed to it."[7] *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). The Court recently reiterated federal officer removal exists to "protect the Federal Government from . . . interference with its operations," avoid "local prejudice against unpopular federal laws or federal officials," and ensure "a federal forum in which to assert federal immunity defenses." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 150, 127 S. Ct. 2301, 2306 (2007) (internal quotations omitted).

By its text, the federal officer removal statute allows removal to federal court of any action brought against:

> [t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official

[7] While the *Davis* Court wrote in reference to a predecessor to the modern § 1442(a)(1), the Supreme Court has recognized that its interpretation of the statute's purpose has remained consistent over the course of its development and expansion. *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151, 127 S. Ct. 2301, 2307 (2007).

> or individual capacity, for or relating to any act under color of such office or on account of any right, title, or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). When the defendant seeking removal is a private entity rather than a government official, the defendant must show it "(1) 'is a person within the meaning of the statute who acted under a federal officer'; (2) 'performed the actions for which it is being sued under color of federal office'; and (3) 'raise[d] a colorable federal defense.'" *Schleider v. GVDB Operations, LLC*, 121 F.4th 149, 158 (11th Cir. 2024) (citing *Caver v. Cent. Ala. Elec. Coop.*, 845 F.3d 1135, 1142 (11th Cir. 2017)); *see also Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 5–8, 146 S. Ct. 1052, 1057–58 (2026).[8]

We begin and end with the first prong. Because the statutory phrase "acting under" is broad, we construe it liberally. *Caver*, 845 F.3d at 1142. However, the concept is not limitless. *Watson*, 551 U.S. at 147, 127 S. Ct. at 2305. To prevent absurd applications of the statute that do not align with its purpose, we must make some distinction between federal contractors who have an "unusually close and detailed regulatory and contractual relationship" with the

---

[8] The Supreme Court's recent decision in *Plaquemines* broadened the second requirement, but it did not change the first requirement. 146 S. Ct. at 1060–62. Neither party disputed that the first requirement was met, so the Court assumed without deciding that it was met. *Id.* at 1057–58, 1060 n.2, 1062 n.5.

federal officer, *Caver*, 845 F.3d at 1146, and those that merely contract with the government as they would with any other customer.

The requisite relationship between the private party and the federal officer is one that "typically involves subjection, guidance, or control." *Watson*, 551 U.S. at 151, 127 S. Ct. at 2307 (internal quotation omitted). Specifically, "the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152, 127 S. Ct. at 2307 (emphasis in original). Importantly, "the private person must help federal officers fulfill a basic governmental task *that the government otherwise would have had to perform.*" *Caver*, 845 F.3d at 1143 (emphasis added). As our sister circuit observed, "a private company selling 'standardized consumer product[s]' to the federal government does not implicate the federal officer removal statute. Even when a contract specifies the details of the sales and authorizes the government to supervise the sale and delivery, the simple sale of contracted goods and services is insufficient to satisfy the federal officer removal statute." *Cnty. Bd. Of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 251 (4th Cir. 2021) (internal citations omitted).

While our caselaw provides us with guideposts, federal officer removal remains a fact-intensive inquiry. The best way to give legal effect to the assortment of interpretive principles appearing in our caselaw is to look closely at the factual milieu in which the principles were formed. The cases reflect two recurring principles separating ordinary government contractors from "unusually

close" ones. First, we look to the degree of the federal government's control over the goods or services contracted for. Second, we look for the federal government's delegation of an authority or duty to the contractor.

**1. Degree of Control Over the Product**

The first principle we pull from our precedent is that the "acting under" relationship must be regulatory in that the federal government exercises control over the product the contractor is producing. An example of a defendant entitled to removal would be a contractor who produces "bespoke goods" or services for the government—that is, the product is made or the job is completed to the government's specifications and with its approval. *See Town of Pine Hill, Ala. v. 3M Co.*, No. 25-10746, 2026 WL 2589473 at *3 (11th Cir. Sept. 2, 2026). This principle calls for a degree of specialization that exceeds the individualized customer service available to any customer.

For example, *Caver* involved a suit brought against the Central Alabama Electric Cooperative ("CAEC"), a highly-regulated private entity that delivered government-subsidized electricity to rural communities. 845 F.3d at 1137–38. Predictably, CAEC removed under the federal officer removal statute. *Id.* at 1138. This Court found CAEC was "acting under" a federal officer where CAEC was "highly regulated" and the federal government "'exercis[ed] extensive supervision over the planning, construction and operation'" of CAEC, which was financed by extremely restrictive

federal loans.[9] *Id.* at 1143 (quoting *Salt River Project Agr. Imp. & Power Dist. v. Fed. Power Comm'n*, 391 F.2d 470, 473 (D.C. Cir. 1968)).

In *Town of Pine Mill*, 3M Company "acted under" a federal officer in producing a firefighting foam, originally developed by the military, which 3M manufactured according to the military's "detailed specifications." 2026 WL 2589473 at *1. We found this level of specialization "crossed the line from merely complying with regulation requirements to performing work 'on behalf of the government.'" *Id.* at *3 (quoting *Caver*, 845 F.3d at 1144).

In *City of Brunswick*, the EPA compelled defendants to conduct environmental remediation pursuant to a consent decree through which the EPA "maintained considerable authority over the remediation activities." *City of Brunswick ex rel. Mayor & Bd. of Comm'rs v. Honeywell Int'l, Inc.*, 184 F.4th 1230, 1246 (11th Cir. 2026). The consent decree allowed the EPA to designate its own employees to oversee and, if necessary, halt the work. *Id.* 1246–47. It even allowed the EPA to "take over performance of the remediation work if it determined that the defendants were not ade-

[9] CAEC's loan agreements with the federal government limited its control over cash distributions to its own members and stockholders. The loan agreements also gave the federal government power to, among other things, set property maintenance and accounting standards, inspect CAEC's internal documents, and regulate and approve plans for construction. *Caver*, 845 F.3d at 1139–40.

quately implementing the remediation plan." *Id.* at 1247. We concluded that the defendants were "acting under" the EPA. *Id.* at 1248.

* * *

With these examples in mind, we turn to the goods and services at issue in this case—the production and publication of advertisements for DHS and the FDA.

Snap argues its agreements with DHS rise to the level of control described by our federal officer removal cases because the agreements "established a framework of cooperation between the agency and Snap" and made Snap a "foundational collaborator" with the federal government. Snap points to research conducted "to help inform" DHS's campaign as well as interactive advertisements Snap custom-made for DHS. Snap argues DHS "determined the questions and answers" to be included in its interactive advertisements and provided Snap with a "creative brief" detailing DHS's goals, message, and branding specifications. Finally, Snap tells us, "DHS approved the final content for the Lens."[10]

With respect to its agreement with the FDA, Snap points to its employment of a "client partner," whose job is to assist the FDA in creating and optimizing advertising campaigns. The FDA also

---

[10] The Snapchat "Lens" created for DHS was an augmented-reality filter that used a smartphone camera to provide a true/false quiz that users could take by selecting their answer with head movements.

provides Snap with "highly detailed" briefs to describe their campaigns. Additionally, the FDA solicits Snap's expertise on how to best reach their desired audience and what methods are available to disseminate their message. These relationships, Snap argues, "more than satisf[y] the acting under requirement." We are not convinced.

At bottom, Snap's relationships with DHS and the FDA represent little more than the relationship between an individual and her local coffee shop. The customer approaches the shop because it advertises a particular product she wants and provides the barista with the details of the beverage she would like to purchase. The barista makes the drink. The customer takes a sip and, demonstrating her approval of the final product, tosses a tip in the jar.

When all is said and done, DHS and the FDA exercise no more guidance or control over Snap than the customer does over the barista. Indeed, the coffee shop may tailor its products to attract that particular customer. And the customer's order may be extremely customized to suit her tastes. But these facts do not indicate that the barista is an agent acting under the authority of the customer.

The literal meaning of the phrase "subjection, guidance, or control" could tolerate an extremely broad interpretation. *Watson*, 551 U.S. at 151, 127 S. Ct. at 2307. But those words come from our caselaw, not the statute. There is a wide chasm between the *type* of control at play when a local electric authority is financed almost

entirely by the federal government and when a social media platform has a federal officer as a customer. Here, Snap sells advertising services to the federal government the same way it would to other customers. While the advertisements are *customized* in the sense that they include the messages requested by the federal customers, they are not unique compared to advertisements Snap creates for other customers—there is nothing unusual about Snap's relationships with DHS and the FDA. While each of the relationships we have described may involve some level of "subjection, guidance, or control," the relationships described in *Caver* and the like extended beyond Snap's relationships with the federal government here. Accordingly, DHS and the FDA's "control" over Snap does not rise to the level of "acting under" a federal official.

**2. Delegation of Duty or Authority**

The second feature we find in our federal contractor cases is the delegation of the federal officer's authority or the assignment of their duty. "[P]recedent and statutory purpose make clear that the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152, 127 S. Ct. at 2307. In *Watson*, the Court ruled that Philip Morris did not act under the FTC, in part because there was "no evidence of any delegation of legal authority from the FTC . . . . Nor [was there] evidence of any contract, any payment, any employer/employee relationship, or any principal/agent relationship." *Id.* at 156, 127 S. Ct. at 2309. In sum, there was no "formal delegation" that might authorize Philip Morris to remove. *Id.* at

156, 127 S. Ct. at 2309–10. This was a "fatal flaw" in Philip Morris' removal argument. *Id.* at 156, 127 S. Ct. at 2309.

In the absence of a formal delegation of authority or duty, we have observed that a contractor is "acting under" a federal officer when the contractor fulfills a government need which, absent a third-party contract, the government would have to fulfill using its own agents. *Id.* at 154, 127 S. Ct. at 2308; *City of Brunswick*, 184 F.4th at 1246 (finding a private party "acted under" a federal officer when the EPA, "wielding authority delegated by the President," compelled a private party to conduct an environmental remediation that the EPA otherwise would have been required to conduct itself).

In *Caver*, we explicitly found that being subject to intense regulation and control was not enough to establish federal officer removal. In addition to being subject to federal control, it was essential to the holding that rural electric cooperatives like CAEC were "chosen by Congress" to achieve its legislative goals. *Caver*, 845 F.3d at 1143. We described cooperatives like CAEC as "instrumentalities of the United States" which "exist to provide a public function conceived of and directed by the federal government." *Id.* at 1143–44. "In [that] sense, CAEC, a non-profit entity funded in part by federal loans, is closer in kind to a federal contractor performing work on behalf of the government than a private business working for its own ends." *Id.* at 1144.

We have found formal delegations authorizing federal officer removal in a variety of legal agreements. In *Magnin v. Teledyne*

*Continental Motors*, we found a formal delegation of authority warranting federal officer removal where a defendant was an aircraft inspector appointed by the FAA pursuant to FAA regulations. 91 F.3d 1424, 1429 n.1 (11th Cir. 1996). In *City of Brunswick*, we found a formal delegation where the EPA used a consent decree to compel the defendant to conduct environmental remediation pursuant to the EPA's duties articulated in CERCLA. 184 F.4th at 1246–47.

* * *

Here, there is no question that DHS and the FDA are acting pursuant to their own statutory authority. The relevant question is whether the MOUs between Snap and DHS (or the advertising contract between Snap and the FDA) are the same kinds of delegations we found in the cases described above. We conclude they are not.

DHS entered into MOUs with Snap pursuant to its authority under 6 U.S.C. §§ 453 and 473. These MOUs were executed to "establish a framework of cooperation between" DHS and Snap. The MOUs described Snap as a "foundational collaborator" that would conduct research, create "digital products" for DHS's campaign, and assist with serving advertisements. DHS met periodically with Snap, provided feedback, and approved the final product.

The FDA contracted with Snap through a third-party marketing agency pursuant to its authority under 21 U.S.C. § 393. Snap appointed an employee to assist the FDA in designing potential advertising campaigns. The FDA sent "highly detailed" briefs to Snap,

describing the type of campaign they wanted. Snap then submitted proposals which the FDA then considered and approved.

Neither of these relationships transcend the business/customer dynamic. It would be inconsistent to describe either of the above examples as DHS or the FDA delegating their own authority to Snap. These agencies had the authority to direct outreach and pursue educational awareness campaigns about designated topics. They did not cede this authority to Snap; instead they used Snap's product to pursue their goals. Snap's "authority" under these agreements was no more significant than their relationship with any other advertiser that approached them.

Nothing in the agreements refer to a delegation of authority and "neither Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so." *Watson*, 551 U.S. at 157, 127 S. Ct. at 2310. Thus, as was the case in *Watson*, the lack of delegation here is a "fatal flaw" to Snap's removal argument. *Id.* at 156, 127 S. Ct. at 2309.

***C. Diversity Jurisdiction***

Though the District Court's denial of the Department's motion to remand to state court rested entirely on the federal removal statute, we need not remand for the District Court to rule on Snap's diversity jurisdiction claim. The record clearly shows that there is no diversity. Indeed, "it is well established that a state," including its "'arm[s]'" and "'alter ego[s],'" "is not a citizen of a state for the purpose of diversity jurisdiction under 28 U.S.C. § 1332." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 412 (11th Cir. 1999) (quoting

*Moor v. Alameda Cnty.*, 411 U.S. 693, 717–18, 93 S. Ct. 1785, 1800 (1973)).

Snap argues that the Department "is a nominal party at best," that Florida Snapchat users under age 16 were the real party in interest, and that the Department brought the suit on their behalf. As such, it is their citizenship that counts for diversity jurisdiction purposes. We reject this position. Though it seems the statutes at issue here were created to protect individual people from harm, the statutes do not require the Department to allege specific harms to bring this suit, *see* Fla. Stat. §§ 501.1736(5), 501.2075, and the Department made no such allegations. Any violation of the statutes results in a civil penalty, *id.*, and the Department seeks those penalties for itself, not on behalf of allegedly injured individuals. The Department is the relevant party, thus there is no diversity jurisdiction.

## III. CONCLUSION

We vacate the District Court's denial of the Department's request for injunction and reverse its denial of the Department's motion to remand to state court. We remand with instructions to remand to the state court.

**VACATED, REVERSED, AND REMANDED.**